GIBSON, DUNN & CRUTCHER LLP
GARETH T. EVANS, SBN 138992
ANDREW Z. EDELSTEIN, SBN 218023
333 South Grand Avenue
Los Angeles, California 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
e-mail:  *gevans@gibsondunn.com*

MILBANK, TWEED, HADLEY &
  McCLOY LLP
JAMES N. BENEDICT, *Pro Hac Vice*
SEAN M. MURPHY, *Pro Hac Vice*
L. ANTHONY PELLEGRINO, *Pro Hac Vice*
One Chase Manhattan Plaza
New York, New York 10005-1413
Telephone: (212) 530-5000
Facsimile: (212) 530-5219
e-mail: *jbenedict@milbank.com*

Attorneys for Defendants
Capital Research and Management Company
and American Funds Distributors, Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| **RACHELLE KORLAND, ON BEHALF OF THE EUROPACIFIC GROWTH FUND,**<br><br>Plaintiff,<br><br>v.<br><br>**CAPITAL RESEARCH AND MANAGEMENT COMPANY, et al.**<br><br>Defendants. | MASTER FILE NO.<br>CV 08-4020 GAF (RNBx)<br><br>**NOTICE OF MOTION AND MOTION TO DISMISS; MEMORANDUM OF POINTS & AUTHORITIES; DECLARATION OF ANDREW Z. EDELSTEIN**<br><br>Judge:      Hon. Gary A. Feess<br>Date:       October 6, 2008<br>Time:       9:30 a.m.<br>Place:      Courtroom 740<br>             255 E. Temple Street<br>             Los Angeles, CA 90012 |

Gibson, Dunn &
Crutcher LLP

TO ALL PARTIES AND THEIR RESPECTIVE ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on October 6, 2008, at 9:30 a.m. or as soon thereafter as this matter may be heard, in Courtroom 740 of the United States District Court, located at 255 E. Temple Street, Los Angeles, California 90012, Defendants Capital Research and Management Company and American Funds Distributors, Inc. (collectively, "Defendants") will and hereby does move the Court to dismiss Plaintiff's Complaint pursuant to Rules 8 and 12(b)(6) of the Federal Rules of Civil Procedure (the "Motion").

As more fully set forth in the accompanying Memorandum of Points and Authorities, Defendants' Motion to Dismiss is made on the following grounds:

Plaintiff's allegations in the Complaint consist of generalized commentary on the mutual fund industry as a whole, and thereby fail to proffer the requisite fund-specific allegations necessary to plead valid causes of action.  The remaining allegations that purport to address specifically the Fund's 12b-1 fees fail for the following reasons:

(1)  The entire premise of Plaintiff's Complaint is based on the argument that Defendant's use of 12b-1 fees to pay for post-sale shareholder services was improper.  But relevant caselaw holds that 12b-1 fees can be used to pay for post-sale shareholder services because such payments result in retained fund assets and additional fund sales, and therefore are made in connection with distribution.  And in any event, the SEC has clearly affirmed on multiple occasions that Rule 12b-1 payments can be used to pay for shareholder services.

(2)  Moreover, Plaintiff's claim is premised on the false assumption that the standard articulated in *Gartenberg v. Merrill Lynch Asset Mgmt.* is not applicable to Section 36(b) claims regarding excessive 12b-1 fees.  But numerous cases have established that the applicable standard for determining whether 12b-1 fees are "excessive" is that Plaintiff must demonstrate that the fees are "disproportionate to

the services rendered." Plaintiff has not made any allegations regarding the services provided, nor how those services are disproportionate to the fees. Moreover, the *Gartenberg* standard requires analysis of six factors to examine the reasonableness of the challenged fees, and the Complaint here barely mentions these factors.

(3) Finally, Plaintiff alleges a claim against CRMC for "control person liability" under Section 48(a) of the ICA. But no implied right of action exists under Section 48(a).

This Motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the accompanying Request For Judicial Notice In Support of Defendants' Motion to Dismiss the Complaint, the accompanying Declaration of Andrew Z. Edelstein In Support of Defendants' Motion to Dismiss the Complaint, and the exhibits attached thereto and such argument and additional papers as may be submitted to the Court before and at the hearing on this Motion.

Dated: September 12, 2008

GIBSON, DUNN & CRUTCHER LLP
GARETH T. EVANS
ANDREW Z. EDELSTEIN


By: _____/s/_____
                  Gareth T. Evans


MILBANK, TWEED, HADLEY &
 McCLOY LLP
JAMES N. BENEDICT
SEAN M. MURPHY
L. ANTHONY PELLEGRINO


By: _____/s/_____
                  James N. Benedict

Attorneys for Defendants
Capital Research and Management Company and
American Funds Distributors, Inc.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

I.    INTRODUCTION ........................................................................... 1

II.   STATEMENT OF FACTS ................................................................ 2

    A.   Background ............................................................................ 2

    B.   Investment Adviser Services and Fees ...................................... 3

    C.   Distribution Services and Fees ................................................. 4

III.  ARGUMENT ................................................................................. 5

    A.   The Complaint Fails To State A Claim Under Section 36(b) Of The ICA. ...................................................................................... 6

        1.   The Standard for Evaluating a Section 36(b) Claim. ................. 6

        2.   Plaintiff's Contention that the Pleading Standard Under 36(b) is Inapplicable is Unavailing and Ultimately Fatal to Her Claim. ............................................................................. 7

            a.   Plaintiff Misunderstands the Law in Arguing For a "Per Se" Violation of Section 36(b). .......................................... 9

            b.   The Use of 12b-1 Fees to Pay for Shareholder Services Does Not Violate Section 36(b). ....................................... 10

        3.   Plaintiff's Complaint Should be Dismissed Because it Fails to Allege Facts Sufficient to Demonstrate that the 12b-1 Fees are Excessive. .......................................................................... 15

            a.   Economies of Scale. ...................................................... 17

            b.   Comparative Fees. ......................................................... 19

            c.   Independence and Conscientiousness of the Independent Trustees. ................................................... 20

    B.   There Is No Implied Right Of Action Under Section 48(a) ............ 22

IV.   CONCLUSION .............................................................................. 23

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alexander v. Sandoval*,
  532 U.S. 275 (2001) ........................................................................... 22

*Amron v. Morgan Stanley Inv. Advisors, Inc.*,
  464 F.3d 338 (2d Cir. 2006) ................................................ 15, 18, 21

*Bell Atl. Corp. v. Twombly*,
  127 S. Ct. 1955 (2007) ......................................................................... 5

*Bellikoff v. Eaton Vance Corp.*,
  481 F.3d 110 (2d Cir. 2007) .............................................................. 7, 9

*Gallus v. Ameriprise Fin., Inc.*,
  497 F. Supp. 2d 974 (D. Minn. 2007) ........................................ 7, 12, 18

*Gartenberg v. Merrill Lynch Asset Mgmt.*,
  694 F.2d 923 (2d Cir. 1982), *cert. denied*, 461 U.S. 906 (1983) ................... passim

*Green v. Nuveen Advisory Corp.*,
  295 F.3d 738 (7th Cir.), *cert. denied*, 537 U.S. 1088 (2002) ................................. 6

*In re Am. Funds Fees Litigs.*,
  No. CV 04-5593 GAF, 2005 U.S. Dist. LEXIS 41884 (C.D. Cal. Dec. 16,
  2005) ............................................................................................. 7, 15, 22

*In re Am. Mut. Funds Fee Litig.*,
  No. CV 04-5593 GAF, 2007 U.S. Dist. LEXIS 8276 (C.D. Cal. Jan. 18,
  2007) ............................................................................................. 22

*In re Davis Selected Mut. Funds Litig.*,
  No. 04 Civ. 4186, 2005 U.S. Dist. LEXIS 23203 (S.D.N.Y. Oct. 11, 2005) ........ 22

*In re Eaton Vance Mut. Funds Fee Litig.*,
  380 F. Supp. 2d 222 (S.D.N.Y. 2005) ................................................. 22

*In re Goldman Sachs Mut. Funds Fee Litig.*,
  No. 04 Civ. 2567 (NRB), 2006 U.S. Dist. LEXIS 1542 (S.D.N.Y. Jan. 3,
  2006) ............................................................................................. 9

*In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig.*,
  434 F. Supp. 2d 233 (S.D.N.Y. 2006) ................................................. 22

*In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*,
  No. 03 Civ. 8208 (RO), 2006 U.S. Dist. LEXIS 20758 (S.D.N.Y. Apr. 14,
  2006) ......................................................................................... 21, 22

*In re Oppenheimer Funds Fees Litig.,*
  426 F. Supp. 2d 157 (S.D.N.Y. 2006) ..................................................... 10

*In re Salomon Smith Barney Mut. Fund Fee Litig.,*
  528 F. Supp. 2d 332 (S.D.N.Y. 2007) ............................................... 10, 22

*ING Principal Prot. Funds Derivative Litig.,*
  369 F. Supp. 2d 163 (D. Mass. 2005) ..................................... 7, 9, 14, 17

*Jones v. Harris Assocs. L.P.,*
  No. 04 C 8305, 2007 U.S. Dist. LEXIS 13352 (N.D. Ill. Feb. 27, 2007),
  *aff'd,* 527 F.3d 627 (7th Cir. 2008), *reh'g denied,* No. 07-1624, 2008 U.S.
  App. LEXIS 16857 (7th Cir. Aug. 8, 2008) .......................................... 18

*Kalish v. Franklin Advisers, Inc.,*
  742 F. Supp. 1222 (S.D.N.Y. 1990) ................................................ 18, 19

*Krantz v. Prudential Inv. Fund Mgmt. LLC,*
  77 F. Supp. 2d 559 (D.N.J. 1999) ......................................................... 5

*Krinsk v. Fund Asset Mgmt., Inc.,*
  654 F. Supp. 1227 (S.D.N.Y. 1987), *aff'd,* 875 F.2d 404 (2d Cir.), *cert.
  denied,* 493 U.S. 919 (1989) ..................................................... 6, 7, 11

*Levy v. Alliance Capital Mgmt. L.P.,*
  No. 97 Civ. 4672 (DC), 1998 WL 744005 (S.D.N.Y. Oct. 26, 1998) .................. 16

*Meyer v. Oppenheimer Mgmt. Corp.,*
  609 F. Supp. 380 (S.D.N.Y. 1984) ....................................................... 11

*Meyer v. Oppenheimer Mgmt. Corp.,*
  707 F. Supp. 1394 (S.D.N.Y. 1988) ...................................................... 12

*Meyer v. Oppenheimer Mgmt. Corp.,*
  764 F.2d 76 (2d Cir. 1985) ........................................................... 6, 12

*Migdal v. Rowe Price-Fleming Int'l, Inc.,*
  248 F.3d 321 (4th Cir. 2001) ......................................................... 7, 21

*Mintz v. Baron,*
  Civ. No. 05-4904 (LTS) (HBP), 2006 U.S. Dist. LEXIS 66867 (S.D.N.Y.
  Sept. 19, 2006) ........................................................................... 6

*Morrison v. Madison Dearborn Capital Partners III L.P.,*
  463 F.3d 312 (3d Cir. 2006) ............................................................. 12

*Olesh v. Dreyfus Corp.,*
  No. CV-94-1664, 1995 WL 500491 (E.D.N.Y. Aug. 8, 1995), *aff'd,* 305
  F.3d 140 (3d Cir. 2002), *cert. denied,* 537 U.S. 1113 (2003) ........................ 5, 16

*Pfieffer v. Bjurman, Barry & Assocs.,*
  Civ. No. 03-9741, 2006 U.S. Dist. LEXIS 7862 (S.D.N.Y. Mar. 3, 2006) ........... 16

*Schuyt v. Rowe Price Prime Res. Fund,*
  663 F. Supp. 962 (S.D.N.Y. 1987) ...................................................... 19

Gibson, Dunn &
Crutcher LLP

iii

*Strougo v. Bea Assocs.*,
   188 F. Supp. 2d 373 (S.D.N.Y. 2002) ................................................................. 21

*Thomas Jefferson Univ. v. Shalala*,
   512 U.S. 504 (U.S. 1994) ...................................................................................... 12

*Williams v. Gerber Prods. Co.*,
   523 F.3d 934 (9th Cir. 2008) .................................................................................. 5

*Yameen v. Eaton Vance Distribs., Inc.*,
   394 F. Supp. 2d 350 (D. Mass. 2005) ............................................................ 9, 15

*Yampolsky v. Morgan Stanley Inv. Advisors Inc.*,
   Nos. 03 Civ. 5710 (RO), 03 Civ. 5896 (RO), 2004 WL 1065533
   (S.D.N.Y. May 12, 2004) ...................................................................................... 15

*Zucker v. AIM Advisors, Inc.*,
   371 F. Supp. 2d 845 (S.D. Tex. 2005) ................................................................. 16

*Zucker v. Federated Shareholder Servs. Co.*,
   No. 2:06 cv 214, 2007 U.S. Dist. LEXIS 15186 (W.D. Pa. Mar. 5, 2007) ............ 16

**STATUTES**

15 U.S.C. 80a-35(b)                  passim

15 U.S.C. 80a-43                  1

15 U.S.C. 80a-47(a)                1, 2, 5, 22

**OTHER AUTHORITIES**

17 C.F.R. 270.12b-1               passim

17 C.F.R. 270.12b-1(d)             8

Fed. R. Civ. P. 12(b)(6)            1, 5

Fed. R. Civ. P. 8               1

NASD Rule 2830              13

Gibson, Dunn &
Crutcher LLP

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendants Capital Research and Management Company ("CRMC" or "Adviser") and American Funds Distributors, Inc. ("AFD" or "Distributor") (collectively, "Defendants") respectfully submit this memorandum in support of their Motion to dismiss Plaintiff's Complaint ("Complaint") pursuant to Federal Rules of Civil Procedure 8 and 12(b)(6).

## I.   INTRODUCTION

Plaintiff, Rachelle Korland, a shareholder in the EuroPacific Growth Fund ("EUPAC" or the "Fund"), brought this action based on allegations that Defendants charged the Fund excessive and disproportionate Rule 12b-1 fees in violation of Sections 36(b) and 48(a) of the Investment Company Act of 1940 ("ICA"), 15 U.S.C. §§80a-35(b), 80a-47(a).

While Plaintiff purports to challenge the 12b-1 fees that the Fund pays to Defendants, a great majority of the allegations in the Complaint consist of generalized commentary on the mutual fund industry as a whole, and thereby fail to proffer the requisite fund-specific allegations necessary to plead valid causes of action.  (*See* Compl. ¶¶ 59-62, 64, 91, 109-16, 118-23, 126-37, 158-64, 179-82.)  As for the remaining allegations that actually purport to attack the Fund's 12b-1 fees, Plaintiff's suit is fatally undermined by three key faulty assumptions.

First, the entire premise of Plaintiff's Complaint is based on the argument that Defendant's use of 12b-1 fees to pay for post-sale shareholder services was somehow improper.  (*See, e.g.*, Compl. ¶¶ 9-10, 25-26, 101.)  But this argument is belied by caselaw and clear guidance from the SEC establishing that 12b-1 payments absolutely *can* be used to pay for post-sale shareholder services.

Second, Plaintiff's claim is premised on the false assumption that the standard articulated in *Gartenberg v. Merrill Lynch Asset Mgmt.*, 694 F.2d 923 (2d Cir. 1982), *cert. denied*, 461 U.S. 906 (1983), is not applicable to Section 36(b) claims regarding

1

excessive 12b-1 fees.  (Compl. ¶ 91 n.5.)  But numerous cases directly on point hold that Plaintiff's conclusion is wrong.  It has long been established that the applicable standard for determining whether fees are "excessive" – including a claim for excessive 12b-1 fees – is that Plaintiff must demonstrate that the fees are "disproportionate to the services rendered."  *See id.* at 928.  But Plaintiff's Complaint contains no allegations regarding the services CRMC provides, let alone how those services might be disproportionate in comparison to the challenged fees.  Moreover, the *Gartenberg* standard requires analysis of six factors to examine the reasonableness of the challenged fees, and the Complaint here barely mentions any of these *Gartenberg* factors.

Lastly, Plaintiff purports to allege a claim against CRMC for "control person liability" under Section 48(a) of the ICA.  But, as both this Court and numerous others have recently held, there is no implied right of action under Section 48(a). Therefore, this claim must be dismissed.

In sum, the Complaint is simply devoid of the required factual and legal allegations necessary to survive a motion to dismiss, and is based on several false assumptions about the law as it relates to Section 36(b) and Rule 12b-1.  For these reasons and those discussed further below, the Complaint should be dismissed with prejudice.

## II.    STATEMENT OF FACTS

### A.    Background

Plaintiff Rachelle Korland, an Ohio resident, alleges that she is the owner and holder of shares in the Fund.  (Compl. ¶ 16.)  The Fund is an open-end, diversified management investment company – *i.e.*, a mutual fund – that is part of the American Funds family of mutual funds.  *See* EuroPacific Growth Fund, Statement of

Gibson, Dunn & Crutcher LLP

Additional Information, at 17 (July 30, 2008) (Declaration of Andrew Z. Edelstein ("Edelstein Decl.") Ex. A).[1]

The Board of Trustees for the Fund includes eleven independent trustees who establish the Fund's policies and supervise and review the operation and management of the Fund. *See id.* at 11-12. The independent trustees are not employed by or otherwise affiliated with CRMC. The Fund also has two interested trustees who are associated with CRMC or affiliated entities. *See id.* at 12-14.

### B. Investment Adviser Services and Fees

Subject to the authority of the Board of Trustees, CRMC serves as investment adviser to the Fund, and has overall responsibility for Fund management. (Compl. ¶ 32-34.) CRMC oversees all investment advisory and portfolio management services for the Fund, and directly, or through agreements with other CRMC affiliates and service providers, manages or supervises all aspects of the Fund's general day-to-day business activities and operations. (Compl. ¶ 34.)

CRMC receives compensation for its services to the Fund pursuant to the Investment Advisory and Service Angreement.[2] *See* EuroPacific Growth Fund, Statement of Additional Information, at 22-24 (July 30, 2008) (Edelstein Decl. Ex. A). Each year, the Fund's Governance and Contracts Committee (the "Contracts Committee") considers the Investment Advisory and Service Agreement and then gives its recommendation as to whether or not they should recommend that the full Board of Trustees approve the agreement. Only independent trustees for the Fund serve on the Contracts Committee. After the Contracts Committee recommends the

---

[1] On a motion to dismiss, the Court may take judicial notice of publicly available documentation including the Fund's Statement of Additional Information. (*See* Defendants' Request For Judicial Notice in Support of Defendants' Motion to Dismiss and accompanying Edelstein Decl.). Plaintiff also incorporated these documents by reference into her Complaint. (Compl. ¶ 184.)

[2] The compensation paid by the Fund to CRMC pursuant to the Investment Advisory and Service Agreement –known as the "advisory fee"–is not alleged to be excessive.

Gibson, Dunn & Crutcher LLP

agreement, the Fund's Board of Trustees then votes on whether or not to approve the Investment Advisory and Service Agreement.  *See id*. at 18.

## C.      Distribution Services and Fees

AFD is the principal underwriter and distributor for the Fund and has the responsibility for the sale of Fund shares.  It is a wholly-owned subsidiary of CRMC. (Compl. ¶¶ 35-37.)  Rule 12b-1, which was promulgated by the SEC in 1980, authorizes a mutual fund board to use the fund's own assets to promote the sale of fund shares, provided certain conditions are met.  In this respect, the Rule provides in pertinent part as follows:

**§ 270.12b-1 Distribution of shares by registered open-end management investment company**.

(a)(1) *Except as provided in this section*, it shall be unlawful for any registered open-end management investment company . . . to act as a distributor of securities of which it is the issuer, except through an underwriter…

(2) For purposes of this section, such a company will be deemed to be acting as a distributor of securities of which it is the issuer, other than through an underwriter, if it engages directly or indirectly in financing any activity which is primarily intended to result in the sale of shares issued by such company, including, but not necessarily limited to, advertising, compensation of underwriters, dealers, and sales personnel, the printing and mailing of prospectuses to other than current shareholders, and the printing and mailing of sales literature;

(b) A registered, open-end management investment company…may act as a distributor of securities of which it is the issuer: Provided, That any payments made by such company in connection with such distribution are made pursuant to a written plan describing all material aspects of the

4

Gibson, Dunn &
Crutcher LLP

proposed financing of distribution and that all agreements with any person

relating to implementation of the plan are in writing…

See 17 CFR 270.12b-1 (2008) (emphasis added); (Compl. ¶ 71 n.2.)

The Fund has adopted Plans of Distribution in accordance with Rule 12b-1.

The Fund initially makes the 12b-1 payment to AFD, but AFD then passes on all but a

small percentage of those 12b-1 fees to broker-dealers who provide services to the

Fund and its shareholders.  The Fund's public filings disclose that "[p]ayments under

the Plans may be made for service-related and/or distribution-related expenses."  See

EuroPacific Growth Fund, Statement of Additional Information, at 27 (July 30, 2008)

(Edelstein Decl. Ex. A).  The Prospectus is clear that for all of the Fund's share

classes, "up to .25% of these expenses may be used to pay service fees to qualified

dealers for providing certain shareholder services."  EuroPacific Growth Fund, Inc.,

Prospectus, at 28 (July 30, 2008) (Edelstein Decl. Ex. B).

### III.    ARGUMENT

Plaintiff's Complaint fails to plead factual allegations in support of a claim

under Sections 36(b) and 48(a) of the ICA, and should be dismissed pursuant to Rule

12(b)(6) of the Federal Rules of Civil Procedure.  "A district court should grant a

motion to dismiss if plaintiffs have not pled 'enough facts to state a claim to relief that

is plausible on its face.'"  Williams v. Gerber Prods. Co., 523 F.3d 934, 938 (9th Cir.

2008) (quoting Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007)).  The ICA

"imposes a large number of threshold determinations before litigation on the merits of

a case may commence," and makes claims brought under the ICA "particularly

appropriate for dismissal for failure to state a claim under Rule 12(b)(6)."  Krantz v.

Prudential Inv. Fund Mgmt. LLC, 77 F. Supp. 2d 559, 562 (D.N.J. 1999) (quoting

Olesh v. Dreyfus Corp., No. CV-94-1664, 1995 WL 500491, at *11 (E.D.N.Y. Aug. 8,

1995)), aff'd, 305 F.3d 140 (3d Cir. 2002), cert. denied, 537 U.S. 1113 (2003).

Gibson, Dunn &
Crutcher LLP

5

**A.      The Complaint Fails To State A Claim Under Section 36(b) Of The ICA.**

**1.      The Standard for Evaluating a Section 36(b) Claim.**

Section 36(b) of the ICA is the exclusive federal remedy for plaintiffs seeking redress for allegedly excessive fees.  Section 36(b) provides, in pertinent part:

> The investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser.

15 U.S.C. § 80a-35(b).  Courts have routinely held that this fiduciary duty under Section 36(b) applies not only to the fees paid for advisory services, but also to other payments, such as those made in connection with Rule 12b-1.  *See Krinsk v. Fund Asset Mgmt., Inc.*, 654 F. Supp. 1227, 1234 (S.D.N.Y. 1987) (dismissing challenge to Rule 12b-1 fee because claim was required to be brought under Section 36(b), and was not), *aff'd*, 875 F.2d 404 (2d Cir.), *cert. denied*, 493 U.S. 919 (1989); *Meyer v. Oppenheimer Mgmt. Corp.*, 764 F.2d 76, 82 (2d Cir. 1985) (stating Section 36(b) governs fees charged under Rule 12b-1); *Mintz v. Baron*, Civ. No. 05-4904 (LTS) (HBP), 2006 U.S. Dist. LEXIS 66867, *9 (S.D.N.Y. Sept. 19, 2006) (holding that Section 36(b) "applies to any fees charged in connection with Rule 12b-1").

Courts have long recognized that Section 36(b) is a "narrow federal remedy" which imposes a "fiduciary duty upon advisers regarding their compensation." *Green v. Nuveen Advisory Corp.*, 295 F.3d 738, 742-43 (7th Cir.), *cert. denied*, 537 U.S. 1088 (2002).  Furthermore, to establish an excessive fee claim under Section 36(b), a plaintiff must plead facts demonstrating that the challenged fee "is so disproportionately large that it bears no reasonable relationship to the services

Gibson, Dunn & Crutcher LLP

rendered and could not have been the product of arm's-length bargaining." *Gartenberg*, 694 F.2d at 928; *see also Gallus v. Ameriprise Fin., Inc.*, 497 F. Supp. 2d 974, 984-85 (D. Minn. 2007) (holding that to state a claim for excessive 12b-1 distribution fees, plaintiff must allege that the fee is disproportionate to the services rendered); *ING Principal Prot. Funds Derivative Litig.*, 369 F. Supp. 2d 163, 167-69 (D. Mass. 2005) (same).  Courts have further held that in order to state a claim under Section 36(b), a plaintiff must allege that the fees are <u>excessive</u> and not simply "'improper.'"  *See Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 117 (2d Cir. 2007) (*quoting Gartenberg*, 694 F.2d at 928.).

Courts – including this Court – have identified six factors to be considered in determining whether the challenged fee is excessive:  (1) the nature and quality of the services provided to fund shareholders; (2) the profitability of the fund to the investment adviser; (3) economies of scale of operating the fund as it grows larger; (4) comparative fee structures; (5) fall-out benefits (*i.e.*, indirect profits to the adviser attributable in some way to the existence of the fund); and (6) the independence and conscientiousness of the directors.  *See, e.g.*, *Gartenberg*, 694 F.2d at 929-30; *Migdal v. Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321, 329 (4th Cir. 2001); *Krinsk v. Fund Asset Mgmt., Inc.*, 875 F.2d 404, 409 (2d Cir. 1989); *In re Am. Funds Fees Litigs.*, No. CV 04-5593 GAF, 2005 U.S. Dist. LEXIS 41884, at *16 (C.D. Cal. Dec. 16, 2005) (Feess, J.).  These factors are typically referred to as the "*Gartenberg* Factors."

> **2.** **<u>Plaintiff's Contention that the Pleading Standard Under 36(b) is Inapplicable is Unavailing and Ultimately Fatal to Her Claim.</u>**

Plaintiff contends – erroneously – that the *Gartenberg* standard under Section 36(b) is inapplicable to determining whether the Distributor Defendant breached its fiduciary duty by charging an excessive fee.  (Compl. ¶ 91 n.5.)  Plaintiff claims that because a portion of the 12b-1 fee is used for "service," the fee is not "primarily

Gibson, Dunn & Crutcher LLP

intended to result in the sale of shares issued by" the Fund, and is therefore "per se excessive and disproportionate" without regard to the *Gartenberg* factors. *Id.* (emphasis added).  Accordingly, Plaintiff seeks to abandon the well-established *Gartenberg* pleading standard under Section 36(b) and replace it with a heretofore non-existent "per se" violation standard. [3]

Plaintiff's legal interpretation of Section 36(b) completely misses the mark. First, courts have consistently held that the standard for determining whether a Rule 12b-1 fee is excessive under Section 36(b) is the same as the standard for determining whether a challenged advisory fee is excessive – *i.e.*, the *Gartenberg* standard.  No court has ever found such a "per se" violation of Section 36(b) to exist.  Second, even if a "per se violation" of Section 36(b) did exist, the use of 12b-1 fees to pay for shareholder services would not support such a claim.  In fact, both the SEC and the courts have expressly found that using 12b-1 fees to fund post-sale shareholder services is not improper.

---

[3] In the alternative, the Plaintiff also argues that even if the 12b-1 fees charged by the Defendants are "primarily intended" to result in the sale of fund shares, they are excessive and disproportionate under the factors set forth by the SEC in the release in which it adopted Rule 12b-1, Investment Company Act Release No. 11414 (Oct. 28, 1980) ("Final Rule Release") (*See* App. Tab A).  But Plaintiff's heavy reliance on the Final Rule Release is a red herring.  (Compl. ¶ 92.)  Contrary to Plaintiff's postulation, the Final Rule Release factors never have been, nor are they currently, mandatory factors that fund directors must review.  Rule 12b-1(d) on its face states that "in fulfilling their duties under this paragraph the directors should consider and give appropriate weight to all pertinent factors."  The Rule also notes that "[f]or a discussion of factors which may be relevant to a decision to use company assets for distribution, see Investment Company Act Release Nos. 10862 (Sept. 7, 1979) (*See* App. Tab B) and [Final Rule Release]." 17 CFR 270.12b-1. Significantly, the SEC decided not to include those factors in the rule itself "[i]n order to avoid the appearance of either unduly constricting the directors' decision making process or of creating a mechanical checklist."  The SEC Release specifically stated that "the Commission has decided not to require the directors to consider any particular factors . . . ."  Final Rule Release at 12 (*See* App. Tab A).  The SEC has asserted (and Plaintiff's Complaint concurs) that these factors only "provide helpful guidance to directors."  *Id; cf.* Compl. ¶ 93 n.6.  It is therefore clear that the SEC has never required directors to consider these factors when approving a 12b-1 plan.  Thus, Plaintiff's fallback argument is baseless.

Gibson, Dunn & Crutcher LLP

### a.   **Plaintiff Misunderstands the Law in Arguing For a "Per Se" Violation of Section 36(b).**

Plaintiff repeatedly argues that Defendants committed a "per se violation" of Section 36(b) by using 12b-1 payments for improper purposes (*i.e.*, post-sale shareholder services).  (*See* Compl. ¶¶ 9-10, 25-26, 31, 75, 78, 90, 101, 191.) Plaintiff's argument is unfounded because no such "per se" standard exists.

As discussed above, it is well established that to state a claim under Section 36(b), a plaintiff must allege that the fees are disproportionate to the services rendered.  Courts have routinely *rejected* attempts by plaintiffs to circumvent this required showing by arguing the fees at issue were "improper" or "per se" unlawful. For example, in cases involving funds closed to new investors, where 12b-1 fees are used almost exclusively for shareholder services, courts have rejected such categorical allegations brought under Section 36(b).  *See In re Goldman Sachs Mut. Funds Fee Litig.*, No. 04 Civ. 2567 (NRB), 2006 U.S. Dist. LEXIS 1542, at *36 (S.D.N.Y. Jan. 3, 2006) (ruling that "merely asserting that Rule 12b-1 fees were charged while the funds at issue were closed to new investors" was insufficient to allege "that the fees charged were disproportionate to the services rendered"); *Yameen v. Eaton Vance Distribs., Inc.*, 394 F. Supp. 2d 350, 358 (D. Mass. 2005) (emphasis added) (finding that the plaintiff relied "upon the categorical contention, rejected by the regulatory bodies charged with supervising this activity, that such fees are per se disproportionately large and hence unreasonable when paid out while the fund is closed" and categorizing the plaintiff's argument as "an erroneous construction of an SEC rule" insufficient "to state a claim under Section 36(b)").  The Second Circuit has also held that an allegation that fees were "improper" – even if true – would not state a claim under Section 36(b).  *See Bellikoff*, 481 F.3d at 117 (*quoting Gartenberg*, 694 F.2d at 928).[4]

---

[4] *See also ING*, 369 F. Supp. 2d at 169 (confirming that "SEC Rule 12b-1 permits fund-advisory firms to recover certain sales-related expenses previously paid out when

Gibson, Dunn & Crutcher LLP

Courts have repeatedly rejected "per se" violations of Section 36(b) in favor of an application of the *Gartenberg* analysis.  *See In re Salomon Smith Barney Mut. Fund Fee Litig.,* 528 F. Supp. 2d 332, 338 (S.D.N.Y. 2007) (concluding that "[t]he § 36(b) test is basically an economic one where the improper use of fees is not 'excessive per se'") (citations omitted); *In re Oppenheimer Funds Fees Litig.*, 426 F. Supp. 2d 157, 158 (S.D.N.Y. 2006) (dismissing plaintiffs' theory that increasing advisory fees "to create a slush fund to bribe brokers for the benefit of the Adviser Defendants and their affiliates" was excessive per se because "§ 36(b) creates no such per se rule").  In fact, no court has ever adopted a "per se" violation of Section 36(b), and Plaintiff's attempt to create such a rule here should be rejected.

> **b.**   **The Use of 12b-1 Fees to Pay for Shareholder Services Does Not Violate Section 36(b).**

Regardless of whether a "per se" violation of Section 36(b) could exist, Plaintiff clearly has not alleged facts that would constitute such a violation.  Indeed, Plaintiff's entire basis for the purported per se violation is premised on a fundamentally incorrect interpretation of Rule 12b-1.  Plaintiff incorrectly assumes that payments made for shareholder services cannot be primarily intended to result in the sale of shares of the Fund, and are therefore improper.  (*See, e.g.*, Compl. ¶ 10.)  This is a blatant misreading of Rule 12b-1.

Funds have the option to decide whether or not to include payments for shareholder service in their Rule 12b-1 Plan.  Although payments for distribution must be made in accordance with a distribution plan approved in conformance with Rule 12(b)-1, payments for service only need to be included in a Rule 12b-1 plan if they are made <u>in connection with</u> distribution.  *See* 17 CFR 270.12b-1.[5]  EUPAC's 12b-1 Plan

---

distributing the fund's shares," and therefore plaintiffs "must also allege that the distribution fees are disproportionate and unrelated to the sales-related services actually provided when shares of the funds were marketed and sold to the general public").

[5] Indeed, the SEC has even explained that "paying for non-distribution services under 12b-1 plans . . . is not prohibited by the present rule[.] . . . Some funds have paid for

Gibson, Dunn & Crutcher LLP

"permit[s] the fund to expend amounts to finance <u>any</u> activity primarily intended to result in the sale of fund shares, provided the fund's board of trustees has approved the category of expenses for which payment is being made."  EuroPacific Growth Fund, Statement of Additional Information, at 27 (July 30, 2008) (emphasis added) (Edelstein Decl. Ex. A).  The service fees approved under the Fund's 12b-1 Plan are made in connection with distribution because the activities the fees are used to finance will help  the fund retain assets, encourage existing shareholders to purchase additional shares in the Fund, and indirectly, help attract new investors.  "Potential benefits of the [12b-1] Plans to the fund include quality shareholder services, savings to the fund in transfer agency costs, and benefits to the investment process from growth or stability of assets."  *Id*. at 29.  Therefore, Plaintiff's claim that payments for service cannot be "primarily intended" to result in the sale of Fund shares (Compl. ¶ 10) is simply wrong.

Courts agree that it is permissible to use 12b-1 fees to pay for service-related activities because those payments fund activities made <u>in connection with</u> distribution. The trial court in *Krinsk* held that "even if payments for shareholder service and maintenance of Fund size are not 'distribution payments,' per se, they are made 'in connection with' a distribution and are therefore to be regulated by the 12b-1 plan." *Krinsk*, 715 F. Supp. at 501; *see also Meyer v. Oppenheimer Mgmt. Corp.*, 609 F. Supp. 380, 389 (S.D.N.Y. 1984) (rejecting plaintiff's argument that using 12b-1 fees to service pre-existing accounts violated Rule 12b-1 because "[e]ven an already

---

such services through a 12b-1 plan, apparently to address the possibility that the payments may later be characterized as distribution expenditures."  Payment of Asset-Based Sales Loads by Registered Open-End Management Investment Companies, Release No. IC-16431, at *68 n.126 (June 21, 1988) (*See* App. Tab C).  As the SEC has stated, funds may choose to pay for services through a 12b-1 Plan or can pay the same service fees directly from fund assets. "To the extent non-distribution expenses are a legitimate fund expense, a fund could pay for such expenses outside the 12b-1 plan, subject to other applicable legal requirements."  *Id*. at *103, n.173.

Gibson, Dunn & Crutcher LLP

existing account may purchase new shares of the Fund").[6]  Further, the Second Circuit in *Meyer* concluded that Rule 12b-1 "refers not to 'distribution expenses' but to any payments 'in connection with' a distribution,"  and remanded the issue with directions "for the district court to invite the SEC to submit its views on the Rule 12b-1 issues, once those issues have been clarified by refinement of appellant's claims." *Meyer*, 764 F.2d at 85.  The district court subsequently upheld its previous ruling that the payments were proper because no additional facts helpful to resolving the 12b-1 issue were discovered on remand.  *See Meyer v. Oppenheimer Mgmt. Corp.*, 707 F. Supp. 1394, 1406 (S.D.N.Y. 1988).  Therefore, AFD's decision to include payments for shareholder services within its Plan of Distribution is proper under both SEC rules and the caselaw.

Even if the Court were to assume (without Defendants conceding the point) that payments for shareholder services were <u>not</u> made in connection with distribution, dismissal is still warranted.  The SEC has often provided guidance that a Rule 12b-1 plan may provide for payments covering both distribution <u>and</u> non-distribution services.[7]  Since at least as early as 1988, the SEC has acknowledged that mutual funds use 12b-1 fees to pay for non-distribution activities, such as "payments to [financial] institution[s] for providing 'administrative services' or 'shareholder

---

[6] In *Gallus v. Ameriprise Financial, Inc.*, plaintiff alleged that the defendants "charged excessive section 12(b) distribution fees in violation of their obligations under section 36(b)." *Gallus*, 497 F. Supp. at 984.  The court held that evidence showing that "<u>85%</u> of Defendants' 12b-1 distribution fees were paid for services to existing shareholders and not to marketing the Funds to new shareholders" was persuasive support for the conclusion that 12b-1 payments benefit existing shareholders. *Id.* at 985 (emphasis added).

[7]  The SEC's interpretation of its own regulation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation. *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 506 (1994) (ruling that the Secretary of Health and Human Services' interpretation of a Medicare regulation that the Secretary issued was a "reasonable construction of the regulatory language" and thus controlling); *see also Morrison v. Madison Dearborn Capital Partners III L.P.*, 463 F.3d 312, 315 (3d Cir. 2006) (affirming dismissal where the court found that the plaintiff's argument was "contrary to the SEC's interpretation of [Securities Exchange Act of 1934 regulations it issued]").

12

services.'" *See* Payment of Asset-Based Sales Loads by Registered Open-end Management Investment Companies, Investment Company Act Release No. 16431, at 39-40  (June 21, 1988) ("1988 Release") (*See* App. Tab C); *see also Investment Company Institute*, SEC No-Action Letter, 1998 SEC No-Act. LEXIS 976, at *14 (Oct. 30, 1998) (the SEC "has stated that funds may pay for non-distribution expenses pursuant to rule 12b-1 plans") (*See* App. Tab D).[8]

In 1992, the SEC approved the adoption of amended NASD Rule 2830, which subjected funds to a maximum asset-based sales charge.  *See* Order Approving Proposed Rule Change Relating to the Limitation of Asset-based Sales Charges as Imposed by Investment Companies, Securities and Exchange Act of 1934 Release No. 30897 (July 13, 1992) (*See* App. Tab F).  Rule 2830 permits funds to pay a maximum .25% asset-based service fee, which is defined as "payments by an investment company for personal service and/or the maintenance of shareholder accounts." Release No. 34-30897 at 3 (*See* App. Tab F).  Following the amendment of the NASD Rule 2830, the SEC explicitly acknowledged that the maximum .25% asset-based service fee was often paid with 12b-1 fees.  *See* Investment Company Act Release No. 26341, at *7 n.25, *6 n.15 (*See* App. Tab G).[9]  Therefore, the SEC has explicitly

---

[8]  *See also* Charles Schwab & Co., Inc., SEC No-Action Letter, 1992 SEC No-Act. LEXIS 861, at *3 n.2 (Aug. 6, 1992) (confirming that "[a] Participating Fund may pay the service fees under a distribution plan adopted under Rule 12b-1 of the 1940 Act") (*See* App. Tab E).

[9] *See also* Registration Form Used By Open-End Management Investment Companies, Investment Company Act Release No. 23064, at 13925 (Mar. 23, 1998) (agreeing with the recommendation of commenters on the proposed rule that the description of 12b-1 fees in the fee table should read "Distribution [and/or Service] (12b-1) Fees", not "Marketing (12b-1) Fees" and adding to the instructions to Item 8 of Form N1-A: "If the Fund pays services fees [as defined by NASD Rule 2830] under its rule 12b-1 plan, modify [the 12b-1] disclosure to reflect the payment of these fees (e.g., by indicating that the Fund pays distribution and other fees for the sale of its shares and for services provided to the shareholders).") (*See* App. Tab H); Registration Form Used By Open-End Management Investment Companies, Investment Company Release No. 22528, at *27 (Mar. 10, 1997) (proposing amendments to the disclosure requirements of Form N1-A and stating that "[a] fund may pay 'service fees' alone or combined with fees for the sale and distribution of its shares") (*See* App. Tab I).

Gibson, Dunn & Crutcher LLP

acknowledged that the very same 0.25% fee that the Plaintiff alleges the Fund is paying for improper purposes can lawfully be used to pay for post-sale service activities.  (*Cf.* Compl. ¶¶ 73, 75, 78.)[10]

Plaintiff defines "servicing efforts" as "providing monthly or quarterly account statements, confirmations of transactions, and suitability analyses of the client's account"  (Compl. ¶ 85), as well as "funding to support the broker dealer [to] maintain [ ] a mutual fund 'supermarket'." (Compl. ¶ 10).  These are the same services the SEC's report on "Mutual Fund Fees and Expenses" indicates that 12b-1 fees may cover.[11]  That report states that 12b-1 fees not only cover distribution and marketing, but also pay for financial advice/planning, consolidated statements, and other services provided by a "mutual fund supermarket."  Division of Investment Management, Securities and Exchange Commission, Report on Mutual Fund Fees and Expenses, at 16 (Dec. 2000) ("2000 Report") (*See* App. Tab J).  Plaintiff cannot properly claim that using 12b-1 fees to pay for post-sale services makes such payments "excessive and disproportionate" as a matter of law when the SEC itself has provided notice to the entire industry that these fees may properly be used for such purposes. [12]

---

[10] Courts addressing the issue have also concluded that 12b-1 fees may properly be used to pay for service activities.  *See e.g.*, *ING*, 369 F. Supp. 2d at 167 (finding that "Rule 12b-1 also permits a mutual fund to compensate broker-dealers with asset-based service fees for providing shareholder services and maintaining shareholder accounts").

[11] Division of Investment Management, Securities and Exchange Commission, Report on Mutual Fund Fees and Expenses, at 17 (Dec. 2000) ("2000 Report") (*See* App. Tab J).

[12] As recently as this week, Andrew Donohue, the head of the SEC's Division of Investment Management, was quoted as follows regarding the SEC's position on Rule 12b-1:

> One way to look at it, is that when it was first adopted, 12b-1 essentially permitted existing fund shareholders to pay for attracting future shareholders.  If you look at the current uses of 12b-1, it really is for current shareholders to pay for current shareholders; they're paying for themselves.  Alternatives have developed to the front-end sales charge.  And that has provided some benefits to investors – an alternative means to purchase

14

3.    **Plaintiff's Complaint Should be Dismissed Because it Fails to Allege Facts Sufficient to Demonstrate that the 12b-1 Fees are Excessive.**

Having misplaced her entire reliance on the argument that the use of 12b-1 fees for service is a "per se" violation of Section 36(b), Plaintiff offers little else that could salvage her claim.  Critically, the Complaint completely fails to meet the long established *Gartenberg* standard for pleading a claim under Section 36(b).  *See* Part III.A., above.  That is, the Plaintiff has utterly failed to allege that the challenged fee is "is so disproportionately large that it bears no reasonable relationship to the services rendered."  *Gartenberg,* 694 F.2d at 928.

Courts have repeatedly granted motions to dismiss Section 36(b) claims where, as here, the plaintiff failed to plead facts alleging a disproportionate relationship between the services rendered and the fees charged.  *See In re Am. Mut. Funds Fee Litigs.*, 2005 LEXIS 41884, at *16 (Feess, J.) (plaintiff must allege "specific facts regarding the disproportionately high nature of the fees in question"); *Yampolsky v. Morgan Stanley Inv. Advisors Inc.*, Nos. 03 Civ. 5710 (RO), 03 Civ. 5896 (RO), 2004 WL 1065533, *2 (S.D.N.Y. May 12, 2004) (dismissing the complaint because it "rel[ied] heavily on generalities about deficiencies in the securities industry, and statements made by industry critics and insiders," but contained no factual allegations "as to the actual fee negotiations or management and distribution services rendered"), *aff'd sub nom. Amron v. Morgan Stanley Inv. Advisors, Inc.*, 464 F.3d 338 (2d Cir. 2006); *Yameen*, 394 F. Supp. 2d at 356 (holding that plaintiffs must "allege some

---

shares.  That wasn't envisioned when 12b-1 was first adopted and one could say the wisdom of 12b-1 was that it permitted that to evolve without additional action by the commission to let that happen.

*Soft Dollars, 12b-1 and Valuation: Q&A With SEC's Donohue*, BoardIQ, Sept. 9, 2008 (Edelstein Decl. Ex. D).  Therefore, the SEC continues to publicly approve of using 12b-1 fees to pay for expenses for servicing existing fund shareholders.

15

relationship between fees charged and the services rendered that, if true, would support a claim that the fees are excessive"); *Levy v. Alliance Capital Mgmt. L.P.*, No. 97 Civ. 4672 (DC), 1998 WL 744005, at *4 (S.D.N.Y. Oct. 26, 1998) (granting motion to dismiss where plaintiff "fail[ed] to explain how the fees and expenses are excessive in light of the 'Gartenberg' factors that courts consider"); *Olesh v. Dreyfus Corp.*, No. 94 Civ 1664, 1995 WL 500491, at *19, 21 (E.D.N.Y. Aug. 8, 1995) (granting motion to dismiss Section 36(b) claim for failing to allege that the fee is so disproportionately large that it bears no reasonable relationship to the services rendered).

Here, Plaintiff has not alleged <u>any</u> facts pertinent to the relationship between the 12b-1 fees charged and the services rendered in return for those fees. Plaintiff alleges only, in barest conclusory fashion, that the 12b-1 fees are excessive and disproportionate because they pay for servicing efforts that are not "'primarily intended to result in the sale of shares issued by' the Fund." (Compl. ¶¶ 87, 90.) However, the Complaint is devoid of allegations concerning the amount of fees paid to and retained by AFD,[13] or the <u>specific</u> <u>services</u> that AFD as the Fund's distributor provides, in return for the fees charged. Additionally, there are <u>no</u> allegations concerning the costs that AFD incurred in providing those services, much less whether

---

[13] Plaintiff acknowledges in her Complaint that the majority of the Rule 12b-1 fees are paid to broker-dealers. (Compl. ¶¶ 10, 78, 177.) But under Section 36(b), AFD can only be liable for the portion of fees that it retains. Courts have held that where, as here, a distributor serves as a pass-through entity for Rule 12b-1 payments, this does not constitute the "receipt of compensation" under Section 36(b). *See Pfieffer v. Bjurman, Barry & Assocs.*, Civ. No. 03-9741, 2006 U.S. Dist. LEXIS 7862, *9 (S.D.N.Y. Mar. 3, 2006). *Pfeiffer* held that (1) "serving as a pass-through entity for Rule 12b-1 payments does not constitute 'receipt' under the ICA" and (2) constructive receipt of payments did not establish that the adviser was the recipient of payments as required by § 36(b). *See id.* at *14-15. *See also Zucker v. AIM Advisors, Inc.*, 371 F. Supp. 2d 845, 849 (S.D. Tex. 2005) (dismissing a complaint alleging that an advisor was liable for allegedly excessive 12b-1 fees because it was an indirect recipient of those fees); *Zucker v. Federated S'holder Servs. Co.*, No. 2:06 cv 214, 2007 U.S. Dist. LEXIS 15186, at *6-7 (W.D. Pa. Mar. 5, 2007) (dismissing a Section 36(b) claim where allegations failed to show that the defendants actually received the fees and ruling that indirect receipt of compensation is insufficient).

16

or not those costs were exceeded by the amount of the 12b-1 fees received.[14]  Without these fundamental allegations, Plaintiff cannot possibly show that the fee is "disproportionately large" when compared to the "services rendered."  Therefore, Plaintiff has failed to state a claim for breach of fiduciary duty under Section 36(b).

Moreover, the Complaint fails to allege facts sufficient to support a claim under <u>any</u> of the *Gartenberg* Factors.  Indeed, of the six *Gartenberg* Factors, Plaintiff's Complaint makes <u>no allegations</u> with respect to <u>three</u> of these factors: (i) the nature and quality of the services provided by the Distributor to the Fund; (ii) the profitability of the Fund to the adviser; and (iii) any fall-out benefits or indirect profits to the adviser attributable in some way to the existence of the Fund.   With respect to the other three *Gartenberg* factors ((i) economies of scale, (ii) comparative fees and (iii) the independence and conscientiousness of the trustees), the Complaint barely makes passing reference to these factors.  These scant allegations hardly support a finding that the 12b-1 fees paid by the Fund are excessive in violation of Section 36(b).

### a.     Economies of Scale.

One of the *Gartenberg* Factors to consider in assessing the reasonableness of the challenged fees is whether the adviser has realized economies of scale with respect to the operation of the Fund and, if so, the extent to which those scale economies have been shared with the Fund shareholders.  While the Complaint does address economies of scale, those allegations actually support dismissal of Plaintiff's claim.

The term "economies of scale" is an economic concept which describes a particular relationship between the size of a mutual fund and the cost of providing services to the fund.  *See Kalish v. Franklin Advisers, Inc.*, 742 F. Supp. 1222, 1237

---

[14] *See ING*, 369 F. Supp. 2d at 169 (ruling that plaintiffs failed to state a claim with respect to the .25% service fees because they did not "allege that the service fees exceed the ongoing expenses associated with maintaining shareholder accounts.  Plaintiffs allege no facts that, if true, would indicate that the service fees are unrelated to the shareholder services provided by broker-dealers").

Gibson, Dunn & Crutcher LLP

(S.D.N.Y. 1990) ("The concept of 'economies of scale' assumes that as a mutual fund increases in size, its operational costs decrease proportionally.").  Accordingly, to adequately allege the existence of economies of scale, a plaintiff must make some allegations regarding the costs to the investment adviser of managing and operating a fund, and show how those costs changed as the fund's assets increased over time.  *See Amron v. Morgan Stanley Inv. Advisors, Inc.*, 464 F.3d 338, 345 (2d Cir. 2006) (finding allegations with respect to Rule 12b-1 fees insufficient because the complaint made "no allegations regarding the costs of performing fund transactions or the relationship between such costs and the number of transactions performed").  To establish a Section 36(b) claim, plaintiffs typically allege that the adviser realized large economies of scale in managing the fund and that it failed to pass those savings on to fund shareholders in the form of lower fees.  *See Jones v. Harris Assocs. L.P.*, No. 04 C 8305, 2007 U.S. Dist. LEXIS 13352, at *25 (N.D. Ill. Feb. 27, 2007) (plaintiffs argued that "breakpoints were not set in relation to any analysis of the savings achieved from economies of scale"), *aff'd*, 527 F.3d 627 (7th Cir. 2008), *reh'g denied*, No. 07-1624, 2008 U.S. App. LEXIS 16857 (7th Cir. Aug. 8, 2008); *Gallus*, 497 F. Supp. 2d at 982 (alleging that defendants "realized enormous economies of scale" that were not appropriately shared with the Funds' shareholders).

Here, however, Plaintiff alleges that Defendants have <u>not realized any economies of scale</u> in managing the Fund.  (Compl. ¶¶ 124-25.)  In this respect, the Complaint cites to a number of broad statements by various industry critics questioning the existence of economies of scale in the mutual fund industry generally (Compl. ¶¶ 108-116, 118, 120-23), and concludes that there are "no economies of scale concerning the performance of the fund because it already is the 11th largest fund in the United States, by assets, as of mid-2007." (Compl. ¶ 117.)  Plaintiff's claim that there are no economies of scale with respect to the Fund severely undermines her excessive fee claim.

Gibson, Dunn &
Crutcher LLP

Moreover, Plaintiff also acknowledges that CRMC has instituted a fee structure that includes fee waivers and breakpoints (Compl. ¶ 149) that lowered fees as the Fund's assets grew.[15]  When combined with the allegation that there are <u>no</u> economies of scale, Plaintiff is conceding that the Fund has instituted mechanisms that share economies of scale with shareholders <u>even</u> <u>though</u> <u>they were</u> <u>never</u> <u>realized</u>.  Such a claim cannot possibly offer any support for an excessive fee claim under Section 36(b).

### b. <u>Comparative Fees.</u>

Likewise, Plaintiff's allegations concerning another *Gartenberg* Factor – comparative fees – are wholly inadequate and also support dismissal.  The closest the Complaint comes to addressing comparative fees is a single allegation "that most mutual funds of the same generic type, including the Fund, charge essentially the <u>same</u> 12b-1 fee percentages . . . ." (Compl. ¶ 181 (emphasis added).)[16]  By alleging that the Fund's 12b-1 fee is "essentially the same" as "most mutual funds of the same generic types," Plaintiff is basically conceding that a "comparative fee" analysis

---

[15]  Plaintiff alleges that the Fund's breakpoints only saved shareholders "a miniscule $7.6 million," but neglects to reference the additional substantial savings that the Fund's fee waivers created.  (Compl. ¶ 150.)  "CRMC is currently waiving 10% of its investment advisory services fees.  During the year ended March 31, 2008, total investment advisory services fees waived by CRMC were $48,848,000.  As a result, the fee shown on the accompanying financial statements of $487,787,000, which was equivalent to an annualized rate of 0.421%, was reduced to $438,939,000, or 0.379% of average daily net assets."  EuroPacific Growth Fund, Annual Report, at 23 (March 31, 2008) (Edelstein Decl. Ex. C).

[16]  Perhaps acknowledging she cannot offer any "comparative fee" allegations that would support a Section 36(b) violation, Plaintiff appears to ask this Court to reject any comparative fee analysis in favor of a "cost-plus" pricing analysis.  (Compl. ¶ 181, alleging that "[t]he correct comparison is not to the 12b-1 fee percentage charged by other similar funds, but to what the cost of the services should be, based upon market price…").  Such an analysis is directly contrary to the legislative history of Section 36(b).  *See Gartenberg*, 694 F.2d at 928 (explaining that the legislative history of Section 36(b) demonstrates that with regard to the investment adviser's compensation "a 'cost-plus' type of contract is not required"); *Kalish*, 742 F. Supp. at 1226 (same); *Schuyt v. Rowe Price Prime Res. Fund*, 663 F. Supp. 962, 972 (S.D.N.Y. 1987) (same).

Gibson, Dunn & Crutcher LLP

would not support a violation of Section 36(b). Indeed, the only way these allegations could possibly support a Section 36(b) claim regarding the Fund's 12b-1 fees is if this Court deemed the entire mutual fund industry to be in breach of its fiduciary duties.

### c.  Independence and Conscientiousness of the Independent Trustees.

The only other *Gartenberg* Factor that the Complaint addresses is the independence and conscientiousness of the Trustees. As with the other factors, Plaintiff's allegations with respect to the independence and conscientiousness of the Independent Trustees consist largely of quotations from industry commentators about the mutual fund industry in general (*see, e.g.*, Compl. ¶¶ 158-64). The Fund-specific allegations that exist in the Complaint are limited to conclusory allegations regarding the number of American Fund Boards that each Trustee is a member of and the amount of time the Fund's Contract Committee spends in formal meetings each year. (Compl. ¶¶ 165-68.) The Complaint alleges that the Fund's Contracts Committee held only one meeting in 2007 and that this meeting was held on the same day as the meetings of the Contracts Committees of certain other funds within the American Funds family of which these same Trustees are members. (Compl. ¶ 170.) The Complaint further asserts that because these meetings were held on the same day, the Fund's Contracts Committee spent an immaterial amount of time considering the Fund's Plan of Distribution. (Compl. ¶¶ 166-75.)[17]

These types of allegations concerning the independence of the Fund's Trustees are patently insufficient. For example, alleging that the Fund's Contract Committee met once in 2007 does not mean that the members of the Committee did not receive and review materials relating to the Fund's Plan of Distribution prior to that meeting,

---

[17]  The Trustees for EUPAC also held six audit committee meetings and two nominating committee meetings during the 2008 fiscal year in addition to the one governance and contracts committee meeting Plaintiff cites in her Complaint. *See* EuroPacific Growth Fund, Statement of Additional Information, at 17-18 (July 30, 2008) (Edelstein Decl. Ex. A).

or at other meetings.  Nor does it mean that members of the Committee did not properly discharge their duties at that meeting.  These types of allegations are clearly insufficient to establish that the Independent Trustees were negligent in protecting the interests of Fund shareholders.  Indeed, courts have repeatedly rejected these type of conclusory allegations as insufficient as a matter of law.  *See, e.g.*, *Migdal*, 248 F.3d at 330 (noting that the fact that a director serves "on multiple boards within a fund complex is insufficient to demonstrate control"); *Amron*, 464 F.3d at 345 (noting that allegations regarding directors' compensation and membership on multiple boards, combined with industry-wide "criticism," fails as a matter of law to demonstrate lack of independence); *Strougo v. Bea Assocs.*, 188 F. Supp. 2d 373, 382 (S.D.N.Y. 2002) (stating that an allegation that board meetings were only two hours was insufficient to state a claim of inattention to duty).

Plaintiff also alleges that the Independent Trustees are not truly independent because only one of five independent trustees on the nominating committee was elected by shareholders. (Compl. ¶¶ 46-48.)  However, such claims are insufficient as a matter of law without further allegations as to how or why this alleged fact undermines the independence of the Fund's directors.  *See In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*, No. 03 Civ. 8208 (RO), 2006 U.S. Dist. LEXIS 20758, at *51 n.26 (S.D.N.Y. Apr. 14, 2006) (citing numerous cases which find that allegations regarding the selection and nomination process for directors or compensation arrangements for directors are not sufficient to establish directors' lack of independence or disinterestedness); *see also Strougo,* 188 F. Supp. 2d at 382 (placing no importance on how independent directors were selected, absent additional information).

Accordingly, the Complaint clearly fails to state a claim under Section 36(b).

Gibson, Dunn & Crutcher LLP

**B.      There Is No Implied Right Of Action Under Section 48(a).**

Plaintiff's claim under Section 48(a) of the ICA also must be dismissed.[18]  As this Court has previously held, "there is no private right under Section 48(a).  District courts, taking direction from *Alexander v. Sandoval*, 532 U.S. 275 (2001), have uniformly held Section 48(a) establishes no private right of action."  *In re Am. Mut. Funds Fee Litig.*, No. CV 04-5593 GAF, 2007 U.S. Dist. LEXIS 8276, *23-24 (C.D. Cal. Jan. 18, 2007) (Feess, J.) (citations omitted).  Indeed, over the last five years, each and every one of the more than twenty courts to have considered the issue have refused to find an implied private right of action under <u>any</u> section of the ICA.  *See, e.g.*, *id.*; *see also In re Am. Funds Fee Litigs.*, 2005 U.S. Dist. LEXIS 41884, at *14 (Feess, J.).[19]  Defendants need not belabor this point further.  Plaintiff's claim under Section 48(a) should be dismissed with prejudice.

//

//

//

//

//

//

//

//

---

[18]  CRMC is only named as a defendant in Plaintiff's Section 48(a) claim.  (Compl. ¶ 197.)  Therefore, to the extent the Section 48(a) claim is dismissed, CRMC should be dismissed from the lawsuit, even if the Section 36(b) claim somehow survives.

[19] *See also, e.g.*, *In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d 579, 603 (S.D.N.Y. 2006) (finding no private right under 48(a)); *In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig.*, 434 F. Supp. 2d 233, 239 (S.D.N.Y. 2006) (ruling no private right under 34(b), 36(a) or 48(a)); *In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*, 2006 U.S. Dist. LEXIS 20758, at *44 (concluding no private right under 34(b) and 48(a)); *In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222, 232 (S.D.N.Y. 2005) (affirming no private right under 34(b), 36(a) or 48(a)); *In re Davis Selected Mut. Funds Litig.*, No. 04 Civ. 4186, 2005 U.S. Dist. LEXIS 23203, at *9 (S.D.N.Y. Oct. 11, 2005) (same).

22

## IV.   CONCLUSION

For the foregoing reasons, the Complaint should be dismissed in its entirety, and with prejudice.


DATED:  September 12, 2008


Respectfully submitted,


GIBSON, DUNN & CRUTCHER LLP
    GARETH T. EVANS
    ANDREW Z. EDELSTEIN


By: _____/s/_____
                      Gareth T. Evans


MILBANK, TWEED, HADLEY & McCLOY LLP
    JAMES N. BENEDICT
    SEAN M. MURPHY
    L. ANTHONY PELLEGRINO


By: _____/s/_____
                      James N. Benedict

Attorneys for Defendants
Capital Research and Management Company and
American Funds Distributors, Inc.

100518575_1.DOC

23

Gibson, Dunn &
Crutcher LLP