1  WOLF HALDENSTEIN ADLER
   FREEMAN & HERZ LLP
2  FRANCIS M. GREGOREK (144785)
   gregorek@whafh.com
3  BETSY C. MANIFOLD (182450)
   manifold@whafh.com
4  RACHELE R. RICKERT (190634)
   rickert@whafh.com
5  WOLF HALDENSTEIN ADLER
      FREEMAN & HERZ LLP
6  750 B Street, Suite 2770
   San Diego, CA 92101
7  Telephone:   619/239-4599
   Facsimile:   619/234-4599
8
9  DANIEL W. KRASNER
   Krasner@whafh.com
10 ROBERT B. WEINTRAUB
   weintraub@whafh.com
11 WOLF HALDENSTEIN ADLER
      FREEMAN & HERZ LLP
12 270 Madison Avenue
   New York, New York 10016
13 Telephone:   212/545-4600
   Facsimile:   212/545-4653
14
15 Attorneys for Plaintiff

16            **UNITED STATES DISTRICT COURT FOR THE**
17
18            **CENTRAL DISTRICT OF CALIFORNIA**

19 RACHELLE KORLAND, ON              ) Case No. CV 08-04020 GAF (RNBx)
20 BEHALF OF THE EUROPACIFIC         )
   GROWTH FUND,                      )
21                                   ) **PLAINTIFF'S MEMORANDUM**
                                     ) **OF POINTS & AUTHORITIES**
22                Plaintiff,         ) **OPPOSING DEFENDANTS'**
                                     ) **MOTION TO DISMISS**
23 vs.                              )
24                                   )
25 CAPITAL RESEARCH AND              ) Judge:        Hon. Gary A. Feess
26 MANAGEMENT COMPANY, et            ) Current Date: January 12, 2009
   al.                               ) Current Time: 9:30 a.m.
27                                   ) Place:        Courtroom 740
                Defendant(s).        )               255 E. Temple Street
28 _____ )               Los Angeles, CA 90012

## **TABLE OF CONTENTS**

**PAGE NOS.**

TABLE OF AUTHORITIES ....................................................................................ii

I.     PRELIMINARY STATEMENT...................................................... 1

II.    CASE SUMMARY ........................................................................ 1

III.   ARGUMENT .................................................................................. 4

A.  Plaintiff Has Sufficiently Pled Defendants' Violations of Rule 12b-1, Giving Rise to Liability under Section 36(b) of the ICA.................................. 4

B.  A 12b-1 Fee May Violate Section 36(b) Without Regard to *Gartenberg* ........ 7

C.  The Complaint's Allegations Are Adequate under *Gartenberg* ..................... 12

1.  The Nature and Quality of the Services Provided............................................ 13

2.  The 12b-1 Fees Were More Than $500 Million Over 3 Years....................... 14

3.  There Were No Economies of Scale, Material or Otherwise........................... 15

4.  Comparing the Fund's Fee Structure with that of Other Similar Funds Illustrates the Lack of Price Competition.......................................................... 17

5.  The Fund's Directors Were Not Independent or Conscientious..................... 17

6.  The SEC's Rule 12b-1 Criteria Further Support the Complaint's *Gartenberg* Analysis ......................................................................................... 20

7.  The *Gartenberg* Analysis Is More Detailed Than in a Related Complaint Previously Sustained By This Court ................................................................. 21

D.  The Section 48(a) Claim Should Not Be Dismissed........................................ 22

IV.    CONCLUSION ............................................................................ 25

i

1

# TABLE OF AUTHORITIES

2

3

**CASES**                                                    **PAGE NOS.**

4    *Alexander v. Sandoval*,

5        532 U.S. 275 (2001) ..................................................................................... 23

6    *Amron v. Morgan Stanley Investment Advisors, Inc.*,

7        464 F.3d 338 (2d Cir. 2006) ........................................................................ 19

8    *Bellikoff v. Eaton Vance*,

9        481 F.3d 110 (2d Cir. 2007) ........................................................................ 10

10   *Erickson v. Pardus*,

11       127 S. Ct. 2197 (2007) .................................................................................. 4

12   *Forsythe v. Sun Life Financial, Inc.*,

13       417 F. Supp. 2d 100 (D. Mass. 2006) ......................................................... 13

14   *Gallus v. Ameriprise Financial, Inc.*,

15       497 F. Supp. 2d 974 (D. Minn. 2007) ......................................................... 11

16
     *Gartenberg v. Merrill Lynch Asset Management., Inc.*,
17       694 F.2d 923 (2d Cir. 1982), *cert. denied*, 461 U.S. 906 (1983)............*passim*

18
     *Goldman Sachs Mutual Funds Fee Litigation*,
19       No. 04-Civ. 2567,

20       2006 U.S. Dist. LEXIS 1542 (S.D.N.Y. Jan. 17, 2006).................................. 9

21
     *Green v. Fund Asset Management L.P.*,
22       19 F. Supp. 2d 227 (D.N.J. 1998) ............................................................ 7, 11

23
     *Green v. Nuveen Advisory Corp.*,
24       186 F.R.D. 486 (N.D. Ill. 1999) ..................................................................... 6

25

26   *ING Principal Protection Funds Derivative Litigation*,

27       369 F. Supp. 2d 163 (D. Mass. 2005) ............................................................ 9

28

*In re American Funds Fees Litigation,*
　　No. 04-5593, 2005 U.S. Dist. LEXIS 41884
　　(C.D. Cal. Dec. 16, 2005)..........................................................................21, 23

*In re American Mutual Funds Fee Litigation,*
　　No. CV-04-5593, 2007 U.S. Dist. LEXIS 8276
　　(C.D. Cal. Jan. 18, 2007)....................................................................................21

*In re Dreyfus Mutual Funds Fee Litigation,*
　　428 F. Supp. 2d 342 (W.D. Pa. 2005),
　　*judgment on the pleadings in defendants' favor on other grounds,*
　　428 F. Supp. 2d 357 (W.D. Pa. 2006)..............................................................24

*In re Evergreen Mutual Funds Fee Litigation,*
　　423 F. Supp. 2d 249 (S.D.N.Y. 2006)..............................................................24

*In re Franklin Mutual Funds Fee Litigation,*
　　388 F. Supp. 2d 451(D.N.J. 2005) ...................................................................24

*In re Morgan Stanley & Van Kampen Mutual Fund Securities Litigation,*
　　No. 03 Civ. 8208 (RO), 2006 U.S. Dist. LEXIS 20758
　　(S.D.N.Y. Apr. 14, 2006) ..................................................................................19

*In re Oppenheimer Funds Fees Litigation,*
　　426 F. Supp. 2d 157 (S.D.N.Y. 2006)...........................................................9, 10

*In re Salomon Smith Barney Mutual Fund Fee Litigation,*
　　528 F. Supp. 2d 332 (S.D.N.Y. 2007)...........................................................9, 10

*Krinsk v. Asset Fund Management,*
　　715 F. Supp. 472, 485 (S.D.N.Y. 1988),
　　*aff'd,* 875 F.2d 404 (2d Cir. 1989) ...............................................................6, 11

*Migdal v. Rowe Price-Fleming International, Inc.,*
　　248 F.3d 321 (4th Cir. 2001)............................................................................19

*Millenco L.P. v. meVC Advisors, Inc.,*
　　No. 02-142-JJF,
　　2002 U.S. Dist. LEXIS 19512 (D. Del. Aug. 21, 2002) ..................................13

*Meyer v. Oppenheimer Management Corp. ("Meyer I"),*
   764 F.2d 76 (2d Cir. 1985) .......................................................................... 6, 11

*Meyer v. Oppenheimer Management Corp.,*
   895 F.2d 861 (2d Cir. 1990) ............................................................................ 6

*Pfeiffer v. Bjurman, Barry & Associates,*
   03 Civ. 9741, 2004 U.S. Dist. LEXIS 16924
   (S.D.N.Y. Aug. 27, 2004) .......................................................................... 6, 13

*Rohrbaugh v. Investment Company Institute,*
   Civ. No. 00-1237, 2002 U.S. Dist. LEXIS 13401
   (D.D.C. July 2, 2002) ...................................................................................... 7

*Siemers v. Wells Fargo & Co.,*
   No. C 05-04518 WHA,
   2006 U.S. Dist LEXIS 60858 (N.D. Cal. Aug. 14, 2006) ........................... 6, 13

*Strigliabotti v. Franklin Resources, Inc.,*
   No. C 04-00883,
   2005 U.S. Dist. LEXIS 9625 (N.D. Cal. Mar. 7, 2005) ................................... 6

*Strougo v. Bea Associates,*
   188 F. Supp. 2d 373 (S.D.N.Y. 2002) ............................................................ 19

*Strougo v. Scudder,*
   964 F. Supp. 783 (S.D.N.Y. 1997) ................................................................. 23

*Wicks v. Putnam Investment Management, LLP,*
   03 Civ. 10988-GAO,
   2005 U.S. Dist. LEXIS 4892 (D. Mass. Mar. 28, 2005) ................................. 13

*Yameen v. Eaton Vance Distributors, Inc.,*
   394 F. Supp. 2d 350 (D. Mass. 2005) ............................................................. 9

1

2

## **STATUTES AND RULES**

3

Investment Company Act of 1940

4

   15 U.S.C. § 80a-12(b) ("Section 12(b)")............................................................. 4, 7

5

   15 U.S.C. § 80a-33(b) ("Section 34(b)")........................................................ 23, 24

   15 U.S.C. § 80a-35(a) ("Section 36(a)") ........................................................ 23, 24

6

   15 U.S.C. § 80a-35(b) ("Section 36(b)")...................................................... *passim*

7

   15 U.S.C. § 80a-47(a) ("Section 48(a)") .............................................. 4, 22, 23, 24

8

NASD Rule 2830.................................................................................................. 11

9

10

SEC Rule 12b-1, 17 C.F.R. § 270.12b-1 ........................................................ *passim*

11

## **OTHER AUTHORITIES**

12

13

U.S. Gen. Accounting Office, Mutual Fund Fees: Additional Disclosure

14

   Could Encourage Price Competition, Rpt. No. GGD-00-126 (June 2000).......... 14

15

Payment of Asset-Based Sales Loads by Registered Open-End

   Management Investment Companies, Investment Company Act

16

   Release No. 16431, 53 Fed. Reg. 23,258 (proposed June 21, 1988) ...................... 10

17

18

Bearing of Distribution Expenses by Mutual Funds, Securities Act

   Release No. 6254, Investment Company Release No. 11414 (Oct. 28, 1980) ....... 20

19

20

21

22

23

24

25

26

27

28

## I.    **PRELIMINARY STATEMENT**

Plaintiff submits this memorandum of law in opposition to the motion of defendants Capital Research and Management Company ("CRMC") and American Funds Distributors, Inc. ("AFD") (collectively "defendants") to dismiss the Complaint.  For the reasons stated below, defendants' motion should be denied.

## II.    **CASE SUMMARY**

This action is brought by a shareholder of the EuroPacific Growth Fund (the "Fund") on behalf of the Fund.  The Fund is one of the mutual funds in the American Funds family of funds, the nation's second largest fund family.  The defendants are the investment adviser (CRMC) and distributor (AFB) of the Fund.

The Complaint alleges that beginning prior to June 18, 2007 and continuing through the present, defendants charged the EuroPacific Growth Fund fees under SEC Rule 12b-1[1] that were unauthorized by the Rule, excessive and disproportionate.  In its fiscal year 2007 alone, the 12b-1 fees paid by the Fund to defendants were more than **$250 million**.  This amount was in addition to the investment advisory fee paid for the same year by the Fund to defendants of approximately $440 million.  In fact, in its three most recent fiscal years, 2006-2008, the Fund paid to defendants more than **$1.6 billion**, at least **$645 million** in 12b-1 fees and **$1 billion** in advisory fees.  Complaint ("Compl.") ¶¶ 145-47, 152. (The appropriateness of the investment advisory fees is not at issue in this action.)  As the Complaint alleges, much of the 12b-1 fees were for services outside what is permitted to be charged for under Rule 12b-1 and, thus, were *ab initio* impermissible and, thus, inherently "excessive" under Section 36(b).  Moreover, to

---

[1] Rule 12b-1, promulgated by the SEC pursuant to the Investment Company Act of 1940 ("ICA"), prohibits mutual funds from directly or indirectly distributing or marketing their own shares unless certain specified conditions set forth in Rule 12b-1 are met, including a limitation on non-advisory fees to those "primarily intended" to result in the sale of mutual fund shares.

the extent that these fees were within the ambit of the rule, and despite the enormous payments by the Fund to defendants, there were no economies of scale or, if there were any economies, only the defendants and not the Fund and its shareholders benefitted from them.  The Complaint alleges that by charging these unauthorized and excessive 12b-1 fees, defendants violated their fiduciary duties under Section 36(b) of the ICA.  Plaintiff seeks to recover (beginning from June 18, 2007), for and on behalf of the Fund, hundreds of millions of dollars in 12b-1 fees and rescission of the 12b-1 plans under ICA § 47(b).

Plaintiff's claims are governed by Rule 8 of the Federal Rules of Civil Procedure, which requires mere notice pleading.  In the face of that immutable principle, defendants' motion to dismiss erects various "straw man" arguments, each of which falls upon scrutiny.

First, defendants incorrectly pigeonhole plaintiff's contention that certain aspects of defendants' 12b-1 fees fall so clearly outside what the plain language of Rule 12b-1 permits (itself a narrow exception to the previous complete statutory bar) as to be inherently excessive – that is, unauthorized by the text of the rule, obviating the need for an elaborate analysis of whether the fees were excessive and disproportionate under *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923 (2d Cir. 1982), *cert. denied*, 461 U.S. 906 (1983).  Defendants attack this threshold definitional argument as an impermissible end-run around the so-called *Gartenberg* factors for Section 36(b) cases.  However, the cases defendants rely on that decline to adopt *per se* rules on the facts presented are inapposite, as none directly involve the threshold determination involved here as to whether the Fund's charges for post-sale, routine account services that customer's brokers are already obligated to provide fall into the narrow Rule 12b-1 sales-related exception.

By statutory mandate, 12b-1 fees can only be used to "finance activities" that are "primarily intended to result in the sale of [Fund] shares."  On their face, post-sale shareholder services such as routine account maintenance tasks are not

"primarily intended to result in the sale of [Fund] shares" because the sale has already occurred. If anything, the use of 12b-1 fees to pay for post-sale services would by the plain reading of the statute violate the regulatory scheme.

Here, as the Complaint alleges, the 12b-1 fees paid for operational and account maintenance activities that the broker-dealer was already legally obligated to provide at the broker-dealer's own expense. Since Rule 12b-1 requires that there be "a reasonable likelihood that the [fees] will benefit the [Fund] and its shareholders," that could not be the case where the broker-dealer was legally obligated to provide the service at its own expense and did not have to be induced to provide that service in return for a payment. That suggests that the fees were outside of the narrow scope of Rule 12b-1 and inherently excessive, without even reaching the *Gartenberg* test. Where activities financed by 12b-1 fees (including, but not limited to, post-sale shareholder services) are not "primarily intended to result in the sale of [Fund] shares," then a fund has strayed beyond what the rule permits, and a Court should never have to reach the *Gartenberg* test.

On the other hand, even if some or all of the 12b-1 fees (whether post- or pre-sale) are deemed to be "primarily intended" to result in the sale of Fund shares and are to be scrutinized under a balancing test, they do not pass muster under the *Gartenberg* test. Contrary to defendants' assertion, the Complaint analyzes all of the applicable *Gartenberg* factors, showing how the Rule 12b-1 fees assessed here fall short of each of those factors. In addition, the Fund breached its fiduciary duties because its Board of Directors failed to give the legally required consideration for its annual approval to continue the Fund's 12b-1 plans, considering each plan for only a few minutes (Compl. ¶¶ 165-76) and failed to negotiate lower 12b-1 fees with broker-dealers. *Id*. ¶¶ 177-82, 191.

Moreover, in addition to the *Gartenberg* factors, which were developed and used exclusively in that decision to analyze investment advisory fees, Rule 12b-1 itself separately identifies nine factors that the SEC states "would normally be

1    relevant to a determination of whether to use fund assets for distribution."
2    Defendants' use of Rule 12b-1 fees is impermissible under those criteria as well.
3    Regardless of whether the SEC's factors or the *Gartenberg* factors are applied, the
4    outcome is the same under either test, and the Complaint readily shows that
5    defendants' conduct violates ICA Section 36(b).  Compl. ¶ 183 n.11.[2]

6          Finally, defendants assert that the "control person" claim under ICA Section
7    48(a) fails as a matter of law.  For the reasons set forth below, this is incorrect under
8    what plaintiff submits respectfully is better reasoned case law when a primary claim
9    under Section 36(b) is properly alleged.

10                              **III.   ARGUMENT**

11   **A.   Plaintiff Has Sufficiently Pled Defendants' Violations of Rule 12b-1,**
12        **Giving Rise to Liability under Section 36(b) of the ICA**

13         The claims herein are governed by Rule 8 of the Federal Rules of Civil
14   Procedure, which requires merely "a short and plain statement of the claim showing
15   that the pleader is entitled to relief."  *Erickson v. Pardus*, 127 S. Ct. 2197, 2200
16   (2007).  Plaintiff's well-pled violations of SEC Rule 12b-1, which give rise to
17   defendants' liability under ICA Section 36(b), clearly pass muster under this test.

18         Prior to the SEC's adoption of Rule 12b-1 in 1980, it was unlawful under
19   Section 12(b) of the ICA for a mutual fund to "to act as a distributor of securities of
20   which it [wa]s the issuer."  One of the reasons this was so is because of the inherent
21   conflicts in the operation of a mutual fund.  Compl. ¶¶ 63-64.  The SEC had
22   recognized these conflicts, stating that "[m]utual funds are unique . . . in that they
23
24   _____
25   [2] Indeed, as discussed in Section III(C)(7), the Complaint's analysis of the
26   *Gartenberg* factors and the supplemental SEC factors is at least as rigorous as
     the amended complaint this Court sustained in related litigation concerning
27   the same American Fund family of funds.
28

                                            4

are 'organized and operated by people whose primary loyalty and pecuniary interest lie outside the enterprise.'"  *Id*. ¶ 59.

In 1978, the SEC announced an "advance notice of proposed rulemaking" concerning whether mutual funds should be permitted to use shareholder "assets to pay expenses incurred in connection with the distribution of their shares."  The SEC proposed the Rule 12b-1 exception for a number of reasons:  net redemptions and lack of growth in the mutual fund industry,[3]  and the desire to increase sales of mutual fund shares to achieve perceived benefits to investors, including that there might be economies of scale as the size of funds increased.

Rule 12b-1(a)(1) states in relevant part that, "it shall be unlawful for any registered open-end management investment company … to act as a distributor of securities of which it is the issuer, except through an underwriter."  Subsection (2) provides a limited exception "if [the company] engages directly or indirectly in financing any activity which is ***primarily intended to result in the sale of shares issued by such company,*** including, but not necessarily limited to, advertising, compensation of underwriters, dealers, and sales personnel, the printing and mailing of prospectuses to other than current shareholders, and the printing and mailing of sales literature."  (Emphasis added.)

Subsection (e) of Rule 12b-1 provides that the approval or continuation of a 12b-1 plan is subject to the fiduciary duties set forth in ICA Section 36(b).  Section 36(b) of the ICA states, in part, that "the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such

---

[3] At the time Rule 12b-1 was adopted in 1980, the mutual fund industry had experienced net redemptions from 1973 – 1979, inclusive, in equity, hybrid and bond mutual funds.  In 1972, the industry had $60 billion in assets, and in 1979 it had $49 billion in assets, in equity, hybrid and bond funds.   Compl. ¶¶ 68-70.

1  investment adviser or any affiliated person of such investment adviser."  The

2  provision further states explicitly that a security holder of such registered investment

3  company may bring an action on behalf of such company, against such investment

4  adviser, or any affiliated person of such investment adviser, for breach of fiduciary

5  duty in respect of such compensation.

6      Courts and the SEC have broadly interpreted the scope of Section 36(b).  It is

7  applicable when one of the statutorily designated recipients benefits from a breach

8  of fiduciary duty.  *E.g.*, *Meyer v. Oppenheimer Mgmt. Corp. ("Meyer I")*, 764 F.2d

9  76, 82 (2d Cir. 1985), *citing* SEC Report, Public Policy Implications of Investment

10  Company Growth, H.R. Rep. No. 2337, 89th Cong., 2d Sess. 144 (1966).

11      Moreover, in proposing Rule 12b-1, the SEC emphasized that the Rule was

12  not intended "to reduce or limit in any way" the fiduciary duties imposed by section

13  36(b).  *Meyer I*, at 82-83, *citing* Bearing of Distribution Expenses by Mutual Funds,

14  Investment Company Act Release No. 10,252 [1978 Transfer Binder] Fed. Sec. L.

15  Rep. (CCH) P 81,603, at 80,415.  *See also Green v. Nuveen Advisory Corp.*, 186

16  F.R.D. 486, 491 (N.D. Ill. 1999).

17      Many courts have held that Section 36(b) applies to violations of Section 12

18  and Rule 12b-1 of the ICA, such as the inherently excessive fee claims alleged here.

19  *Meyer v. Oppenheimer Mgmt. Corp.*, 895 F.2d 861, 866 (2d Cir. 1990); *Meyer I*,

20  764 F.2d at 82-83 (reversing dismissal of section 36(b) claim); *Siemers v. Wells*

21  *Fargo & Co.*, 2006 U.S. Dist. LEXIS 60858, at *48-*61 (N.D. Cal. Aug. 14, 2006)

22  (motion to dismiss denied on merits, granted on procedural grounds); *Strigliabotti v.*

23  *Franklin Res*., Inc., 2005 U.S. Dist. LEXIS 9625, at *20 (N.D. Cal. Mar. 7, 2005);

24  *Pfeiffer v. Bjurman, Barry & Assocs.*, 2004 U.S. Dist. LEXIS 16924, at *12

25  (S.D.N.Y. Aug. 27, 2004) (same); *Krinsk v. Asset Fund Mgmt.*, 715 F. Supp. 472,

26  485 (S.D.N.Y. 1988), *aff'd*, 875 F.2d 404 (2d Cir. 1989) (bench trial).

27

28

**B.**     **A 12b-1 Fee May Violate Section 36(b) Without Regard to *Gartenberg***

Prior to the SEC's adoption of Rule 12b-1 in 1980, it was unlawful under Section 12(b) of the ICA for a mutual fund "to act as a distributor of securities of which it [wa]s an issuer."  Compl. ¶ 63.  In response to a stock market downturn in the 1970s, which resulted in the net redemption of mutual funds, Rule 12b-1 was adopted for the limited purpose of "financing any activity which is ***primarily intended*** to result in the sale of shares issued by such company."   Thus, it logically follows that the use of shareholder funds to finance any activity not "primarily intended" to result in the sale of Fund shares would be outside the parameter of the lawful use of shareholder funds.  Such use, financing an activity not primarily related to the sale of fund shares, would be unauthorized or "excessive" as a matter of law, and would not be subject to the *Gartenberg* analysis, which is a fact-based balancing test applicable only to the statutorily permitted fees.

Courts have acknowledged that excessiveness under the *Gartenberg* balancing test is not the only remediable violation of Section 36(b), but that other more hard and fast violations are actionable.  For example, in *Green v. Fund Asset Mgmt., L.P.*, 19 F. Supp. 2d 227 (D.N.J. 1998), the court denied a motion to dismiss a Section 36(b) claim where, without considering the *Gartenberg* factors, the fee arrangement was rife with conflicts of interest.  The court noted, "Section 36(b) of the ICA is not expressly limited to situations in which the advisory fees received by an investment advisor were excessive, disproportionate or otherwise unreasonable. The statute encompasses the receipt of fees by an investment advisor in violation of the advisor's fiduciary duty." *Id*. at 234 (citations omitted).  *See also Rohrbaugh v. Inv. Company Inst.*, 2002 U.S. Dist. LEXIS 13401, at *31-*32 (D.D.C. July 2, 2002) ("a section 36(b) claim must either involve a challenge to excessive advisory fees *per se* or to conduct that results in excessive advisory fees").  In other words, there can be a violation of Section 36(b) not only because of excessive fees under

1    *Gartenberg*, but also because they are not permitted in the first instance because

2    they are not "primarily intended to result in the sale of [Fund] shares".

3          The language of Rule 12b-1 itself confirms this analysis.  The Rule expressly

4    identifies one example of an activity that a 12b-1 fee cannot be used to finance: it

5    includes among a list of permitted activities that are primarily intended to result in

6    the sale of fund shares the "mailing of prospectuses ***to other than current***

7    ***shareholders***" (Rule 12b-1(a)(2)), making it clear that such a mailing to existing

8    shareholders is outside the exception.  Defendants cannot seriously contend that if a

9    mutual fund paid 12b-1 fees to a broker-dealer or underwriter for it to mail

10   prospectuses to current shareholders, then financing that activity would not be

11   expressly unauthorized by the rule; but, that it instead would be evaluated under the

12   *Gartenberg* factors.  Indeed, defendants' analysis would make every fund

13   management activity "primarily intended to result in the sale of [Fund] shares."

14         Here, scores of millions of dollars in 12b-1 fees are used to pay for post-sale

15   shareholder services that cannot be "primarily intended to result in the sale of

16   [Fund] shares."  Account maintenance services such as regular account statements

17   do not highlight one security (they list all securities) or even relate to any particular

18   security in the account (but, instead, relate to all), thus eliminating any reason for

19   defendants to pay for such services.  Moreover, the broker-dealer would provide

20   them in any event, irrespective of whether any mutual fund paid for the activities,

21   because it is legally obligated to do so.  Compl. ¶¶ 10, 88, 90-91.  The Fund and its

22   shareholders do not benefit from the Fund's payment of 12b-1 fees for post-sale

23   shareholder services.  The only beneficiaries are defendants.

24         Defendants mischaracterize plaintiff's threshold definitional argument,

25   contending that plaintiff simply asserts it is a *per se* violation of section 36(b) when

26   12b-1 payments are used for improper purposes.  Defs. Mem. at 9.  This is

27   incorrect.  What plaintiff asserts is that the Fund's 12b-1 fees for shareholder

28

1   services on their face stray beyond the narrowly crafted permitted exception

2   contained in Rule 12b-1 and, thus, are by definition "excessive."

3   　　　Moreover, defendants also mischaracterize the case law, which they

4   incorrectly insist holds that there can never be a definitional violation of section

5   36(b) absent examination of the *Gartenberg* factors.  The courts that have declined

6   to apply a *per se* rule, however, did so because of a failure, specific to each case, to

7   allege facts to make out a *per se* violation; not because there could be no actionable

8   violation outside of the economic *Gartenberg* factors.

9   　　　In particular, three decisions cited by defendants – *Yameen v. Eaton Vance*

10   *Distribs., Inc.*, 394 F. Supp. 2d 350, 358 (D. Mass. 2005), *ING Principal Prot.*

11   *Funds Derivative Litig.*, 369 F. Supp. 2d 163, 168-9 (D. Mass. 2005), and *Goldman*

12   *Sachs Mut. Funds Fee Litig.*, 2006 U.S. Dist. LEXIS 1542, at *36 (S.D.N.Y. Jan.

13   17, 2006) -- each hold only that distribution fees taken from a closed fund were not

14   *per se* unlawful simply because the fees were used to pay deferred sales charges

15   incurred while the fund was open and the plaintiffs did not refute that the funds in

16   question would cease payments after they had fully compensated distributors on

17   previous sales.  In *Yameen, ING* and *Goldman Sachs*, the plaintiffs failed to allege

18   that the defendants continued to take 12b-1 fees from the closed funds after they had

19   been completely reimbursed for their earlier sales-related expenses.  In that

20   circumstance, the pleading of a specific economic fact that was not protected by the

21   12b-1 exception to the prohibition on distribution spending would have stated a

22   claim.  Here, plaintiff alleges that the 12b-1 fees are outside of the carve-out and

23   that they were unauthorized because they were spent on non-distribution services.

24   　　　Similarly, *In re Salomon Smith Barney Mut. Fund Fee Litig.*, 528 F. Supp. 2d

25   332, 338 (S.D.N.Y. 2007), and *In re Oppenheimer Funds Fees Litig.*, 426 F. Supp.

26   2d 157, 158 (S.D.N.Y. 2006), held only that where a *per se* claim is not sufficiently

27   alleged, then the *Gartenberg* economic test is applied.  *Salomon* held that "where

28   the improper use of fees is not 'excessive per se,'" the test is basically an economic

1  one, 528 F. Supp. 2d at 338, meaning there could be circumstances where a *per se*

2  claim would be sufficiently alleged.  In *Oppenheimer*, plaintiff alleged that advisory

3  fees used to create a slush fund to bribe brokers were improper *per se*.  The court

4  rejected that argument because plaintiff did not connect that assertion to any

5  allegation that the fees were materially disproportionate.  426 F. Supp. 2d at 158.

6  Unlike here, there was no claim in either *Salomon* or *Oppenheimer* that the fees in

7  question were expressly outside what was permitted by the ICA or any SEC rule.

8  (Defendants' other case on this point, *Bellikoff v. Eaton Vance*, 481 F.3d 110, 117

9  (2d Cir. 2007), does not even address the *per se* issue.)

10  In addition to overstretching the case law, defendants mischaracterize various

11  SEC pronouncements in arguing that there can be no *per se* violation of Rule 12b-1.

12  For example, the purportedly seminal document they cite (Defs. Mem. at 12-13),

13  ICA Release No. 16431 (1988), is a proposal to amend 12b-1.  Defendants contend

14  that this Release holds that 12b-1 fees may be used to pay for non-distribution

15  shareholder services, and thus are subject to *Gartenberg* and cannot be *per se* out-

16  of-bounds.  That release, however, merely states that some funds have paid for

17  shareholder services through a 12b-1 plan "apparently to address the possibility that

18  the payments may later be characterized as distribution expenditures."  Critically,

19  the release states also that the expense must be a "*legitimate non-distribution*

20  *service*."  ICA Release 16431 at 40 (emph. added).

21  Defendants' whole argument is premised on the conclusion they jump to that

22  since 12b-1 fees may be used to pay for shareholder services that are not distribution

23  payments as such as long as they are "connected" to distribution, then such use can

24  never be *per se* forbidden by the rule.  But, even assuming *arguendo* that defendants

25  may properly characterize these fees as service fees "connected to" distribution,

26

27

28

10

none of defendants' citations[4] address the most narrow situation presented here:  is a 12b-1 payment for shareholder services that are unrelated to distribution *per se* outside the scope of Rule 12b-1 because the payment can never be a "legitimate non-distribution service" when the broker-dealer already is legally obligated to provide the service to the shareholder?[5]  Plaintiff submits that, at least for pleading purposes, the answer must be affirmative.

In any event, despite defendants' creating this straw man issue, we respectfully suggest that there is nothing for this Court to decide on a motion to dismiss with respect to a threshold definitional claim because it would still require development of the factual record to demonstrate its existence.  "Determining whether this kind of fee arrangement constitutes a per se breach of fiduciary duty requires an exploration of the economic realities of such funds and market circumstances and practices.  This determination cannot be made on the pleadings." *Green*, 19 F. Supp. 2d at 235 (denying motion to dismiss).

---

[4] In *Krinsk v. Fund Asset Mgmt., Inc.*, 715 F. Supp. 472, 501 (S.D.N.Y. 1988), for example, the payments in question were to financial consultants retained to halt the out-flow of assets to further promote sales rather than for routine maintenance services, such as are involved here.  *Meyer I*, 764 F.2d at 84-85, concerned sales efforts to existing customers; the plaintiff attacked the uses to which the fees had been put by the recipients rather than whether the fees were within the scope of the rule itself.  Indeed, the Second Circuit cautioned that "[w]e are not prepared to say at this point that the possibility of additional share purchases makes payments for all costs of shareholder servicing a distribution expense contemplated by the rule." *Id.* at 85.  Finally, *Gallus v. Ameriprise Fin., Inc.*, 497 F. Supp. 974 (D. Minn. 2007), did not involve a categorical challenge under 12b-1 and, thus, did not address its definitional scope, but, rather, undertook a conventional *Gartenberg* analysis.

[5] NASD Rule 2830, relied on by defendants, addresses fee caps for broker-dealers generally and does not specifically address Rule 12b-1, nor does it change the fact that the rule is subject to the requirements of Rule 12b-1, which does not establish a safe harbor from Section 36(b) liability.  Release 16431 at 40 n.128.

11

**C.**      **The Complaint's Allegations Are Adequate under *Gartenberg***

Even if the fees in question were not inherently barred by Rule 12b-1, they do not meet the *Gartenberg* criteria and are excessive and disproportionate.  The "*Gartenberg* factors," discussed in detail below, are:  (1) the nature and quality of the services provided by the advisers to the shareholders; (2) the profitability of the mutual fund to the adviser-manager; (3) "fall-out" benefits; (4) the economies of scale achieved by the mutual fund and whether such savings were passed on to the shareholders; (5) comparative fee structures with other similar funds; and (6) the independence and conscientiousness of the mutual fund's outside directors.  694 F.2d at 928-29.  Contrary to defendants' insistence, the Complaint addresses all of these factors expressly (or, in the case of fall-out benefits, in broad substance).

Defendants' assertion that the Complaint contains essentially no factual allegations whatsoever on the *Gartenberg* factors, but just conclusory statements, is flatly incorrect.  The facts detailed herein – the nature and quality of the services provided to the Fund in relation to the statutory limits on financing and the legal obligations of the broker-dealers; the *billions* of dollars in 12b-1 fees and advisory fees paid to defendants; the size of the Fund (the eleventh largest in the nation), with $115 billion in assets (as of mid-2007), and the lack of economies of scale or of economies that have been passed along to the Fund and its shareholders; the lack of price competition with other funds; the failure of the Fund's board of directors to give material consideration to the annual reapproval requirement and to obtain price concessions from broker-dealers concerning payments for commissions and services, and, most tellingly, defendants' admission that, to them, it is not relevant whether economies of scale benefit the existing shareholders of the Fund – all strongly support the conclusion that the motion to dismiss should be denied.  This is so because even if all of defendants financing activities are "primarily intended" to sell Fund shares, the 12b-1 plans have benefitted only defendants by increasing their advisory fees and have not produced any benefits for the Fund or its shareholders.

The factual detail set forth in the Complaint is more than adequate under *Gartenberg*.  The case law is clear that the short and plain statement of the claim under Rule 8 does not require that each and every *Gartenberg* factor be addressed at all, let alone addressed in detail.  Indeed, defendants ignore that the *Gartenberg* decision itself was the appeal of a judgment entered after a non-jury trial.  694 F.2d at 925, 929-31.  *E.g.*, *Wicks v. Putnam Inv. Mgmt., LLP*, 2005 U.S. Dist. LEXIS 4892, at *12-13 (D. Mass. Mar. 28, 2005) ("I agree with the plaintiffs that *Gartenberg* -- should it be the appropriate standard--does not establish a heightened pleading requirement for *§ 36(b)* excessive fee claims"); *Pfeiffer,* 2004 U.S. Dist. LEXIS 16924, at *15, *18, (it "is unnecessary for the plaintiff to set forth evidentiary details to support this allegation, or to support those elements of the *Gartenberg* test that may apply to promotion, distribution and service fees"); *Millenco L.P. v. meVC Advisors, Inc.*, 2002 U.S. Dist. LEXIS 19512, at *9 n.3 (D. Del. Aug. 21, 2002) (same); *see also Siemers,* 2006 U.S. Dist LEXIS 60858 at *51-52; *Forsythe v. Sun Life Fin., Inc.,* 417 F. Supp. 2d 100, 113-6 (D. Mass. 2006).

### 1.   The Nature and Quality of the Services Provided

As  the Complaint alleges, for a substantial number of years, defendants have charged the Fund and its shareholders hundreds of millions of dollars in both yearly 12b-1 and advisory fees.  The Fund charges the maximum amount permitted by law for shareholder services, whether pre-sale or post-sale – 0.25% – which is the same percentage charged by a majority of funds.  Compl. ¶¶ 73, 78, 181.  This reflexive adoption of the maximum fee permitted illustrates that despite the immense size of the Fund and of the American Funds family overall, defendants did not seek to obtain and did not obtain any benefits for the Fund and its shareholders, such as a reduction in the amount paid to broker-dealers to finance services nor a limitation on the types of activities that would be financed by the 12b-1 fees.

Defendants have admitted that a material portion of the Fund's hundreds of millions of dollars in 12b-1 fees paid to defendants are used to finance post-sale

shareholder services.  Compl. ¶¶ 89, 100.  But, this portion of the 12b-1 fee finances activities that the broker-dealer was legally obligated to provide to account holders at the broker-dealer's own expense.  Compl. ¶¶ 10, 88, 90-91.  The broker-dealer did not have to be induced to provide that service in return for a payment.

All mutual funds are in the same position vis-à-vis a broker-dealer with respect to provision of these services, meaning a broker-dealer would be legally obligated to provide these services for all its clients who owned a mutual fund, regardless of which mutual fund the client owned.  There would be no reason for a mutual fund to pay the broker-dealer for these services.  Moreover, the average account size for a fund in the American Fund family is $25,000 and 60% of the accounts are under $10,000.  Compl. ¶ 28.  Common sense suggests that such small accounts do not need substantial expenditures on shareholder services.

The Fund also charges the maximum 12b-1 fee for commissions, 0.75%, the same percentage charged by most funds.  Compl. ¶¶ 76-77.  Similar to its arrangement on shareholder services, defendants did not obtain from the broker-dealers a limitation on commissions.  *Id.* ¶¶ 177-82, 191.

Thus, defendants made no attempt to compete on the basis of fees.  Instead, defendants accepted the fees and coverage sought by the broker-dealers without even attempting to negotiate a better deal for the Fund and its shareholders. Complaint ¶¶ 178-79.  *See* Mutual Fund Fees:  Additional Disclosure Could Encourage Price Competition, General Accounting Office, Rpt. No. GGD-00-126 at 62 (June 2000).  Accordingly, under the express language of Rule 12b-1, there cannot be "a reasonable likelihood that the [12b-1 fees] will benefit the [Fund] and its shareholders" under these circumstances.

### 2.   <u>The 12b-1 Fees Were More Than $500 Million Over 3 Years</u>

In its fiscal year 2006, the 12b-1 fees paid by the Fund were approximately $195 million and the advisory fees paid were approximately $251 million, for a total for 2006 of approximately **$446 million**.  In its 2007 fiscal year, the 12b-1 fees paid

by the Fund were at least $250 million and the advisory fees paid were approximately $348 million, for a total for 2007 of at least **$598 million**. Although complete figures were not available for its 2008 fiscal year at the time the action was commenced, 12b-1 fees were also approximately in the $225 – $300 million range and advisory fees were approximately $438 million, for a total for 2008 of more than **$600 million**. Compl. ¶¶ 145-46, 152. Thus, in just the last three fiscal years, the Fund paid more than **$1.6 *billion*** combined in 12b-1 fees and advisory fees, of which at least **$645 million** was 12b-1 fees.

It is also noteworthy that in 2007 alone, the approximately 30 funds in the American Funds family, the nation's second largest fund family, in total paid defendants more than ***$2 billion*** in 12b-1 fees (even though certain types of expenses such as advertising (in some circumstances) and account maintenance are not dependent on which particular American Fund mutual fund one owns). *See* Compl. ¶¶ 7, 25, 99 n.7. Both on their face, and in conjunction with defendants' failure to create or pass on economies of scale to the Fund and its shareholders, these incredibly large amounts raise factual issues about whether the 12b-1 fees were excessive and disproportionate.

### 3.      There Were No Economies of Scale, Material or Otherwise

The 12b-1 fees did not create any economies of scale for the Fund from which investors benefited. As a threshold matter, and regardless of the size of a fund, economies of scale do not exist for investors in the mutual fund industry on 12b-1 fees, which are only a "dead-weight cost borne by both current and new shareholders," as numerous studies cited in the Complaint demonstrate. Compl. ¶¶ 108-115, 134-37.

The lack of 12b-1 economies of scale for investors are exacerbated by the sheer size of the Fund. As of mid-2007, the Fund was the 11th largest fund in the United States, with assets of more than $115 billion. Compl. ¶¶ 117, 149-50. Thus, even if 12b-1 fees are not inherently a dead-weight cost borne by shareholders, and

economies of scale might exist, there are no economies of scale in a fund the size of the Fund, as studies cited in the Complaint demonstrate.  *Id*. ¶¶ 117-25.  Moreover, even if economies of scale were created for the Fund as it grew larger, no material savings were passed on to the Fund and its shareholders.  This is not surprising, given that ***Defendants have conceded publicly that it is not relevant whether economies of scale benefit the existing shareholders of the Fund***.  *Id*. ¶ 144.

For example, although defendants use breakpoints[6] in calculating the advisory fee, the breakpoint savings to the Fund were *de minimis* – only about $7.6 million in 2007.  In its fiscal year 2007 alone, the 12b-1 fees paid by the Fund to defendants (or accrued against the Fund) were more than **$250 million** and the advisory fee was **$348 million**, for a total of **$598 million**.  The breakpoint savings for the three years ending with fiscal 2007 inclusive were less than $24 million.  In essentially the same three year period, the 12b-1 fees paid by the Fund to defendants (or accrued) were at least approximately **$650 million** and the advisory fees were **799 million**, for a total of more than **$1.4 billion**.  Compl. ¶¶ 145-52.

Assuming *arguendo* defendants passed along to the Fund the breakpoint savings described above, the less than $24 million in savings is immaterial as a matter of law when compared to the approximately $650 million in 12b-1 fees and $799 million in advisory fees paid by the Fund to defendants in just the last three years.  Thus, even if all activities financed by the plans herein are primarily intended to result in the sale of fund shares, the 12b-1 plans have not produced material economies of scale benefits for the Fund and its shareholders.[7]

---

[6] The investment advisory fee is calculated as a percentage of the Net Assets of the Fund.  The percentage sliding scale contained "breakpoints," which are decreases in the marginal percentage charged for the investment advisory fee as the Net Assets of the Fund increase.  Compl. ¶ 149.

[7] Defendants turn the legal analysis on its head concerning the absence of economies.  Even assuming *arguendo* that defendants' partial fee waiver and breakpoint analysis is applicable, if there are no economies of scale, then the Fund (continued…)

16

### 4. **Comparing the Fund's Fee Structure with that of Other Similar Funds Illustrates the Lack of Price Competition**

The Fund charged the maximum amount permitted by law for shareholder services, 0.25%, which is the same percentage charged by a majority of funds. Compl. ¶¶ 73, 78, 181.  The same holds true for commissions, where the Fund charged the maximum 12b-1 fee, 0.75%.  *Id.* ¶¶ 76-77.  Similar pricing among competing mutual funds "does not support an inference that competition" exists and that the similar market price was reached through free and open competition. Instead, the lack of price competition suggests a lack of competition between advisers for fund business given the "unseverable relationship between the adviser-manager and the fund it services."  *Gartenberg*, 694 F.2d at 929 ("We disagree with the district court's suggestions that … a fee is fair if it 'is in harmony with the broad and prevailing market choice available to the investor.' … [T]he existence in most cases of an unseverable relationship between the adviser-manager and the fund it services tends to weaken the weight to be given to rates charged by advisers of other similar funds").  Compl. ¶¶ 178-79 (GAO Study).

### 5. **The Fund's Directors Were Not Independent or Conscientious**

Nor did the Fund's Board of Directors fulfill its responsibilities in overseeing, on a yearly basis, whether the Fund's 12b-1 plans should be continued.  After initial adoption, a 12b-1 plan must be reapproved yearly.  In order to continue a plan, the Fund's Board must conclude, "in light of their fiduciary duties under" Section 36(b) of the ICA, that "there is a reasonable likelihood that the plan will benefit the

_____

(…continued)

and its shareholders paid $250 million in 12b-1 fees in 2007; received no benefits in return for the $250 million; and, given the increase in the size of the Fund, paid an increased net advisory fee (after any waiver) of $349 million in 2007, which was $97 million more than the 2006 net fee – for a net detriment to the Fund and its shareholders of hundreds of millions of dollars per year.

17

company [the Fund] and its shareholders."  Rule 12b-1(e), Compl. ¶ 71 n.2.  The SEC has identified nine "normally relevant" factors *infra* for a board to consider.

The Complaint makes the following detailed allegations about the Board's lack of independence and conscientiousness.

- The Fund has a Board of Directors whose members have not been elected by the shareholders in many years, who rarely meet, whose focus is spread over many different funds in the American family of funds, and who receive material compensation from the American family of funds.

- Each so-called independent Director of the Fund sits on approximately four to five boards of directors of mutual funds within the American Fund family and their respective Contracts Committees.

- These common board members meet simultaneously as the boards of those funds.

- The Contracts Committee of the Fund held only one meeting during the 2007 fiscal year, which was held simultaneously, or *seriatim* on the same day, with the meetings of the Contracts Committees of the other funds within the American family of funds.

- Given that the Contracts Committee and/or the Board of the Fund held only one meeting each during the 2007 fiscal year, which was held simultaneously, or *seriatim* on the same day, with the meetings of the Contracts Committees and/or the Boards of other funds within the American family of funds, and assuming an eight hour workday, the Contracts Committee of the Fund and/or the Board would have each spent materially less than two hours total considering all of the Fund's many plans of distribution combined.

- Given the number of Contracts Committees and Boards that, respectively, were meeting during one day, the Contracts Committee

18

1  and Board of the Fund must have, during 2007 and prior years, spent an

2  immaterial amount of time considering the Fund's Plans of Distribution.

3  ● In this limited amount of time, the Contracts Committee of the

4  Fund, as well as the Board of the Fund, could not possibly have

5  examined in any meaningful way, as required by their fiduciary duty,

6  the [nine] factors for continuing a 12b-1 Plan of Distribution, and were

7  limited simply to acting year after year as a rubber stamp for the

8  proposals of defendants regarding 12b-1 fees.

9  ● Hence, the Fund's Contracts Committee and Board gave the

10  Fund's 12b-1 Plans only a perfunctory and not the careful consideration

11  required as to whether the plans should be continued.

12  ● The very fact that the Fund's shareholders for a number of

13  years have been paying between $80 million and $250 million a year in

14  12b-1 fees, on top of paying approximately $120 million to $450 million

15  a year in investment advisory fees, while receiving a benefit of at most

16  $7 million per year in advisory fee breakpoints, in itself demonstrates

17  the Board's failure to give the legally required consideration to its

18  annual approval for continuation of the Fund's 12b-1 Plans.

19  Compl.  ¶¶ 165-68, 170-75.  These allegations, taken as a whole, are sufficient for

20  pleading purposes under *Gartenberg*.[8]  *See also* ¶¶ 164, 177-82, 189, 191.

21

22  [8] The cases cited by the defendants (Mem. at 21) are off point.  *In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*, No. 03 Civ. 8208 (RO), 2006 U.S. Dist.

23  LEXIS 20758 (S.D.N.Y. Apr. 14, 2006), concerned an Investment Advisor Act

24  claim.  *Migdal v. Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321 (4th Cir. 2001), was not a *Gartenberg* excessive fee claim but a direct claim against the directors as

25  interested persons.  *Strougo v. Bea Assocs.*, 188 F. Supp. 2d 373 (S.D.N.Y. 2002),

26  was an ICA § 36(a) claim decided upon summary judgment.  *Amron v. Morgan Stanley Inv. Advisors, Inc.*, 464 F.3d 338 (2d Cir. 2006), did not contain the

27  specificity of the allegations here.

28

19

**6.** **The SEC's Rule 12b-1 Criteria Further Support the Complaint's** *Gartenberg* **Analysis**

In addition to the *Gartenberg* factors, the Complaint cites SEC criteria for setting Rule 12b-1 fees that support plaintiff's allegations. Rule 12b-1 itself expressly refers to the SEC Release that published the rule as adopted, ICA Release No. 11414, "for a discussion of factors which may be relevant to a decision to use company assets for distribution." Compl. ¶ 93.[9]

These SEC criteria provide further support to plaintiff's *Gartenberg* analysis. For example, it is clear, given the size of the Fund, that there is no "problem or circumstance" making continuation of the plans "necessary or appropriate." Criteria Nos. 2-4. Compl. ¶¶ 95-101. Moreover, the hundreds of millions of dollars in 12b-1 fees benefit only defendants, but not the Fund or its shareholders. Criteria Nos. 7-8. For at least a number of years, the Fund's 12b-1 plans have provided no or *de minimis* benefits for the Fund and its shareholders. Criteria No. 9. Compl. ¶ 176.

---

[9] The Release identifies the factors that it believes "provide helpful guidance to directors" in pertinent part as follows: "(2) consider the nature of the problems or circumstances which purportedly make implementation or continuation of such a plan necessary or appropriate; (3) consider the causes of such problems or circumstances; (4) consider the way in which the plan would address these problems or circumstances and how it would be expected to resolve or alleviate them, including the nature and approximate amount of the expenditures; the relationship of such expenditures to the overall cost structure of the fund; the nature of the anticipated benefits, and the time it would take for those benefits to be achieved; ... (7) consider the possible benefits of the plan to any other person relative to those expected to inure to the company; (8) consider the effect of the plan on existing shareholders; and (9) consider, in the case of a decision on whether to continue a plan, whether the plan has in fact produced the anticipated benefits for the company and its shareholders."

**7.**    **The *Gartenberg* Analysis Is More Detailed Than in a Related Complaint Previously Sustained By This Court**

Not only is the Complaint's *Gartenberg* analysis ample for pleading purposes, but this Court has already sustained a Complaint in a similar action concerning other mutual funds in the American Funds family with a far less detailed *Gartenberg* analysis.  In that action, in its first ruling on the pleadings, the Court, *inter alia*, directed that any further amended complaint address the *Gartenberg* factors in more detail.  Dkt. 151, *In re Am. Funds Fees Litig.*, 2005 U.S. Dist. LEXIS 41884, at *14-18 (C.D. Cal. Dec. 16, 2005) ("*Corbi*").

A comparison of the *Corbi* Second Amended Complaint ("CSAC"),[10] filed after that December 2005 ruling[11] with the Complaint here demonstrates that if the CSAC's *Gartenberg* analysis was adequate, then *a fortiori* this Complaint's *Gartenberg* analysis is adequate.  The CSAC, in its section alleging that the 12b-1 fees were excessive, addressed only three of the *Gartenberg* factors:  the 12b-1 fees were excessive because they were not used for services that benefitted the fund, CSAC ¶¶ 48-52; the 12b-1 fees were excessive to the advisory fees charged, CSAC ¶¶ 53-58, and the continued growth of the fund inhibited superior returns, CSAC ¶¶ 59-72.  The CSAC addressed other *Gartenberg* factors only in its section alleging the advisory fees were excessive.  But, the CSAC did not address these factors with respect to the excessiveness of the 12b-1 fees, and only one of these factors was applicable to, or did not duplicate, the discussion in the 12b-1 section of the CSAC - - the economies of scale were not passed to investors, CSAC ¶¶ 110-16.  Nor did the CSAC address the additional SEC criteria discussed above.

---

[10] The CSAC is Exhibit A to the Declaration of Robert B. Weintraub filed herewith.

[11] The Court did rule on a motion directed to the CSAC, *In re Am. Mut. Funds Fee Litig.*, 2007 U.S. Dist. LEXIS 8276 (C.D. Cal. Jan. 18, 2007), although defendants did not directly challenge the CSAC's *Gartenberg* analysis.

Here, the Complaint directly and extensively addresses five of the six *Gartenberg* factors (all but the fall-out benefits) by name.  The Complaint alleges specific facts under each of the *Gartenberg* factors, although the headings do not necessarily use *Gartenberg's* literal words:  (1) the nature and quality of the services provided by the 12b-1 fees to the Fund and its shareholders.  (Compl. ¶¶ 73-101, 177-82);  (2) the profitability of the mutual fund to the defendants (Compl. ¶¶ 7-8, 73-78, 145-52); (3) the economies of scale achieved by the mutual fund and whether such savings were passed on to the shareholders (Compl. ¶¶ 107-57);  (4) comparative fee structures with other similar funds (under the heading the Board's failure to negotiate lower fees) (Compl. ¶¶ 73-78, 177-83); and (5) the independence and conscientiousness of the mutual fund's outside directors (Compl. ¶¶ 40-58, 158-76).  *See also* Compl. ¶¶ 102-06 (interrelationship of the Plans and defendants' other activities) (akin to fall-out benefits).  Finally, unlike the CSAC, the Complaint addresses the additional SEC criteria discussed in subsection 6.

All these facts, far more detailed than those in the CSAC, strongly support the conclusion that the motion to dismiss should be denied.

**D.**     **The Section 48(a) Claim Should Not Be Dismissed**

The Complaint also contains a claim under Section 48(a) of the ICA against the parent management company, defendant CRMC, for what is in effect "control person" liability.  Section 48(a) states "It shall be unlawful for any person, directly or indirectly, to cause to be done any act or thing through or by means of any other person which it would be unlawful for such person to do under the provisions of this title or any rule, regulation, or order thereunder." 15 U.S.C. § 80a-47(a).  The provision is akin to § 15 of the Securities Act of 1933 and § 20(a) of the Securities Exchange Act of 1934 in that it makes control persons liable for primary violations of underlying acts.  As many courts have recognized, § 48(a) "is remedial and is to be construed liberally."  *See Strougo v. Scudder*, 964 F. Supp. 783, 806 (S.D.N.Y.

1997), *dismissed on other grounds*, 27 F. Supp. 2d 442 (S.D.N.Y. 1998), *vacated in part and remanded*, 282 F.3d 162 (2d Cir. 2002).

Defendants rely on an earlier decision by this Court in *Corbi*.  However, there is a contrary line of cases, which plaintiff respectfully submits should be followed here, that hold that if the underlying claim alleging a primary violation is not dismissed (here, §36(b)), then the 48(a) claim also is sustained.

The decisions defendants rely on apparently derive from the United States Supreme Court's decision in *Alexander v. Sandoval*, 532 U.S. 275 (2001), which held, in a different context, that there was no private right of action to enforce regulations promulgated under Title VI of the Civil Rights Act of 1964.  The issue in these cases was the criteria for determining whether an implied private right of action existed.  These decisions did not address the question, presented here, whether when a statute, Section 36(b) of the ICA, contains an express private right of action with respect to a particular substantive provision of the ICA, and a violation of a control parent section, Section 48(a), is predicated upon the Section 36(b) violation, should there be a private right of action under Section 48(a) against the parent company.  The court decisions cited in defendants' brief did not directly address this issue (nor did this court in *Corbi*, as the *Corbi* plaintiffs acceded at oral argument to the dismissal of that claim).

We respectfully disagree with the line of decisions that extend the *Alexander* analysis to section 48(a).  For example, most of the 48(a) decisions cited in defendants' memorandum also discuss court decisions holding that there are no private rights of action under ICA Sections 34(b) and 36(a).  Section 34(b) states "[i]t shall be unlawful for any person to make any untrue statement of a material fact in any registration statement," but does not expressly create a private right of action.  ICA section 36(a) expressly states that "[t]he Commission is authorized," but does not identify any other permitted plaintiff.  Concerning both of these sections, the courts note that ICA Section 42 authorizes the SEC to enforce all provisions of the

23

ICA.  Thus, Section 34(b) contains a substantive violation but does not expressly create a private right of action to enforce it.  Section 36(a) contains an injunctive provision, but it is expressly limited to actions by the SEC.  The difference between these provisions and 36(b) is that unlike these sections, Section 36(b) expressly creates a private right of action with respect to a substantive provision of the ICA and the Section 48(a) claim is expressly predicated upon a violation of 36(b), and merely adds additional persons who may be named as defendants in such a claim.

In other words, plaintiff believes that the best way to harmonize these cases is to draw a distinction between (1) a plaintiff asserting a claim under an ICA section, such as 34(b), that does not have an express private right of action, where there would be no standalone private right of action under Section 48(a); and (2) a plaintiff asserting a claim under § 36(b), where the Section 48(a) claim is predicated on the express private right of action.  Courts have sustained the latter such claim. *In re Evergreen Mut. Funds Fee Litig.*, 423 F. Supp. 2d 249, 259-60 (S.D.N.Y. 2006); *In re Franklin Mut. Funds Fee Litig.*, 388 F. Supp. 2d 451, 469 (D.N.J. 2005); *In re Dreyfus Mut. Funds Fee Litig.*, 428 F. Supp. 2d 342, 356 (W.D. Pa. 2005), *judgment on the pleadings in defendants' favor on other grounds*, 428 F. Supp. 2d 357 (W.D. Pa. 2006).

# IV.   **CONCLUSION**

For the reasons set forth above, defendants' motion to dismiss should be denied in its entirety.[12]

DATED: November 26, 2008                    Respectfully submitted,

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP


   /s/  Robert B. Weintraub
Daniel W. Krasner
Robert B. Weintraub
270 Madison Ave.
New York, NY 10016
(212) 545-4600 (Phone)
(212) 545-4653 (Facsimile)
krasner@whafh.com
weintraub@whafh.com

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP
Francis M. Gregorek
Betsy C. Manifold
Rachele R. Rickert
750 B Street, Suite 2770
San Diego, CA 92101
(619) 239-4599 (Phone)
(619) 234-4599 (Facsimile)
gregorek@whafh.com
manifold@whafh.com
rickert@whafh.com

Attorneys for Plaintiff

/526198v18

---

[12] If this Court should grant the dismissal motion, plaintiff intends to amend her complaint as of right under Rule 15(a) (1) of the Federal Rules of Civil Procedure.

25